# SUPREME COURT OF THE UNITED STATES,

AT

## OCTOBER TERM, 1889.

---

## HANS v. LOUISIANA.

No. 4. Argued and submitted January 22, 1890. — Decided March 3, 1890.

A State cannot, without its consent, be sued in a Circuit Court of the United States by one of its own citizens, upon a suggestion that the case is one that arises under the Constitution and laws of the United States.

*Chisholm* v. *Georgia*, 2 Dall. 419, questioned.

While a State cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its contracts may be judicially resisted; and any law impairing the obligation of contracts under which such property or rights are held is void, and powerless to affect their enjoyment.

THIS was an action brought in the Circuit Court of the United States, in December, 1884, against the State of Louisiana by Hans, a citizen of that State, to recover the amount of certain coupons annexed to bonds of the State, issued under the provisions of an act of the legislature approved January 24, 1874. The bonds were known and designated as the "consolidated bonds of the State of Louisiana," and the coupons sued on are for interest which accrued January 1, 1880. The grounds of the action were stated in the petition as follows:

"Your petitioner avers that by the issue of said bonds and

coupons said State contracted with and agreed to pay the bearer thereof the principal sum of said bonds forty years from the date thereof, to wit, the first day of January, 1874, and to pay the interest thereon represented by coupons as aforesaid, including the coupons held by your petitioner, semi-annually upon the maturity of said coupons; and said legislature, by an act approved January 24, 1874, proposed an amendment to the constitution of said State, which was afterwards duly adopted, and is as follows, to wit:

"'No. 1. The issue of consolidated bonds, authorized by the general assembly of the State at its regular session in the year 1874, is hereby declared to create a valid contract between the State and each and every holder of said bonds, which the State shall by no means and in nowise impair. The said bonds shall be a valid obligation of the State in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof or the levy and collection of the tax therefor. To secure such levy, collection and payment the judicial power shall be exercised when necessary. The tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year until said bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the State to the holders of said bonds as the principal and interest shall fall due, and no further legislation or appropriation shall be requisite for the said assessment and collection and for such payment from the treasury.'

"And petitioner further avers that, notwithstanding said solemn compact with the holders of said bonds, said State hath refused and still refuses to pay said coupons held by petitioner, and by its constitution, adopted in 1879, ordained as follows:

"'That the coupon of said consolidated bonds falling due the first of January, 1880, be, and the same is hereby, remitted, and any interest taxes collected to meet said coupons are hereby transferred to defray the expenses of the state government;' and by article 257 of said constitution also prescribed that 'the constitution of this state, adopted in eighteen hundred and sixty-eight, and all amendments thereto, is declared

to be superseded by this constitution;' and said State thereby undertook to repudiate her contract obligations aforesaid and to prohibit her officers and agents executing the same, and said State claims that, by said provisions of said constitution, she is relieved from the obligations of her aforesaid contract and from the payment of said coupons held by petitioner; and so refuses payment thereof and had prohibited her officers and agents making such payment.

"Petitioner also avers that taxes for the payment of the interest upon said bonds, due January 1, 1880, were levied, assessed and collected, but said State unlawfully and wrongfully diverted the money so collected, and appropriated the same to payment of the general expenses of the State, and has made no other provision for the payment of said interest.

"Petitioner also avers that said provisions of said constitution are in contravention of said contract, and their adoption was an active violation thereof, and that said State thereby sought to impair the validity thereof with your petitioner in violation of article 1, section 10, of the Constitution of the United States, and the effect so given to said state constitution does impair said contract.

"Wherefore petitioner prays that the State of Louisiana be cited to answer this demand, and that after due proceedings she be condemned to pay your petitioner said sum of ($87,500) eighty-seven thousand five hundred dollars, with legal interest from January 1, 1880, until paid, and all costs of suit; and petitioner prays for general relief."

A citation being issued, directed to the State, and served upon the governor thereof, the attorney general of the State filed an exception, of which the following is a copy, to wit:

"Now comes defendant, by the attorney general, and excepts to plaintiff's suit on the ground that this court is without jurisdiction *ratione personæ.* Plaintiff cannot sue the state without its permission; the constitution and laws do not give this honorable court jurisdiction of a suit against the state, and its jurisdiction is respectfully declined.

"Wherefore respondent prays to be hence dismissed, with costs and for general relief."

By the judgment of the court this exception was sustained, and the suit was dismissed. See *Hans* v. *Louisiana*, 24 Fed. Rep. 55. To this judgment the present writ of error was brought.

*Mr. J. D. Rouse,* (*Mr. William Grant* was also on the brief,) for plaintiff in error.

I. The sole question arising in this case, and now here presented for the first time, is: " Does the judicial power of the United States extend to a case arising under the Constitution or laws of the United States and originally brought against a State by one of its own citizens ? "

The judicial power of the United States is established by the Constitution, and its extent is defined by section 2 of article 3, which is as follows:

" The judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States and treaties made or which shall be made under their authority ; to all cases affecting ambassadors, other public ministers and consuls ; to all cases of admiralty and maritime jurisdiction ; to controversies to which the United States shall be a party ; to controversies between two or more States ; between a State and citizens of another State ; between citizens of different States ; between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign states, citizens or subjects."

The provision is mandatory, and has always been held to include all that the fullest scope given to the language requires. *Osborn* v. *United States Bank,* 9 Wheat. 738 ; *Cohens* v. *Virginia,* 6 Wheat. 264 ; *Tennessee* v. *Davis,* 100 U. S. 257 ; *Railroad Co.* v. *Mississippi,* 102 U. S. 135 ; *Mayor* v. *Cooper,* 6 Wall. 247 ; 3 Webster's Works, 334, 482.

II. But it is contended by the defendant that because of its sovereignty it is excepted from the operation of this general grant of judicial power. There is no warrant for the proposition either in the history of the constitution or in its judicial interpretation.

The sovereignty of the States is limited by the Constitution. No State can enter into any treaty, alliance or confederation; grant letters of marque, pass any bill of attainder, or grant any title of nobility. These and many other rights and powers inherent in sovereign States were surrendered to the federal government by the adoption of the Constitution.

Sovereign States may not be sued without their consent, but by the federal Constitution the States submitted themselves to the judicial power of the Union in many named cases. It was expressly extended to controversies between two or more States; between a State and citizens of another State, and between a State and foreign states, citizens or subjects.

This was necessary for the establishment of justice, and to insure that domestic tranquillity which was among the chief objects of the Constitution; because controversies would inevitably arise between the States themselves, as well as between the States and citizens of sister or foreign states, which might not involve any question arising under the Constitution or laws of the United States, jurisdiction over which had already been given in all cases, without regard to parties, whether States or individuals.

In *Chisholm* v. *Georgia*, 2 Dall. 419, a citizen of South Carolina sued the State of Georgia, invoking jurisdiction under that clause of the Constitution extending the judicial power to controversies between States and citizens of other States. It was contended on behalf of the State of Georgia that while a State might sue a citizen of another State in the federal courts, the State could not there be sued; but this court held that it could be.

This decision was followed by the adoption of the Eleventh Amendment to the Constitution, declaring that "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

This is a limitation upon the exercise of judicial power in the cases named. Upon no principle of construction can the limitation be applied to other cases. No change in the Con-

stitution was made in any other respect. The judicial power still extends to all cases over which it was granted, excepting only suits in law or equity commenced or prosecuted *against* a State by a citizen of another State or of a foreign State. Suits may still be brought by a foreign State against a State of the Union, by one State against another or against the citizens of another State. *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265.

III. The jurisdiction has been exercised in cases too numerous to mention. See, especially, *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *New Hampshire* v. *Louisiana*, 108 U. S. 76, 90; *Tennessee* v. *Davis*, 100 U. S. 257, 266; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Cohens* v. *Virginia*, 6 Wheat. 264, 279; *Ames* v. *Kansas*, 111 U. S. 449; *Carter* v. *Greenhow*, 114 U. S. 317, 322; *Civil Rights Cases*, 109 U. S. 3, 12.

In *In re Ayers*, 123 U. S. 443, the contempt proceedings were in a suit instituted by aliens, and therefore held not to be within the jurisdiction of the court, because of the Eleventh Amendment. The cases of *Hagood* v. *Southern*, 117 U. S. 52, and *Louisiana* v. *Jumel*, 107 U. S. 711, were held to be in effect suits against a State within the prohibition of the amendment, the plaintiffs being citizens of another State.

IV. The third article of the constitution declares that "the judicial power of the United States shall be vested in one Supreme Court and in such other inferior courts as the Congress may from time to time ordain and establish." The language of this article is mandatory upon the legislature. *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 334.

By the judiciary act of 1789, sec. 13, it is enacted that "the Supreme Court shall have *exclusive* jurisdiction of controversies of a civil nature where a State is a party, *except between a State and its citizens;* and except also between a State and citizens of other States, or aliens, in which latter case it shall have original but not exclusive jurisdiction," 1 Stat. 80, c. 20, § 13; thus clearly recognizing that controversies might arise between a State and its citizens within the judicial power of the United States.

The Constitution is the supreme law of the land, and upon

its adoption the sovereignty of the States ceased to exist as to all matters confided to the federal government. *Dodge* v. *Woolsey*, 18 How. 331. By their own consent the States submitted themselves to the judicial power of the United States in all cases to which that power extends. The submission of the original States was voluntary. The territory of Orleans possessed no sovereignty, but the act of Congress, authorizing the people thereof to form a constitution and state government, required the convention to adopt the Constitution of the United States, and to transmit to Congress the instrument by which its consent to said Constitution was given, 2 Stat. 641, c. 21; and the act admitting the State of Louisiana into the Union declared this condition, among others, a fundamental condition of such admission. 2 Stat. 701, c. 50.

V. The State of Louisiana, when it entered into the contract upon which the plaintiff sues, submitted itself to the judicial power for its enforcement.

Section 11 of the act under which the bonds were issued provided that each provision of the act should be a *contract* between the State of Louisiana and each and every holder of the bonds. A constitutional amendment further provided that no court should enjoin the payment of the principal, or the levy and collection of the tax therefor, and that the judicial power should be exercised, when necessary, to secure such levy, collection and payment. It was competent for the State to thus subject itself to suit in the state courts. *Curran* v. *Arkansas*, 15 How. 304; *Davis* v. *Gray*, 16 Wall. 203, 221.

By the submission of herself to the judicial power of her own courts the State submitted herself to the judicial power of the federal courts having jurisdiction *ratione materiæ*. She submitted herself to the jurisdiction of the court below, because she made no exception. Even the Supreme Court of Louisiana, in the case of the *State ex rel. Hart* v. *Burke*, put her exemption from suit to enforce this contract upon the ground that the constitutional amendment of 1874, which submitted the State of Louisiana to the judicial power, had been repealed by the Constitution of 1879 and that the power of submission was taken away.

The Supreme Court of Louisiana assumed, that, although the Constitution of the United States prohibited the State from passing any law impairing the validity of a contract, the State by the adoption of a constitution could avoid that prohibition. The court overlooked the numerous decisions of this court declaring that provision of the Constitution to be directed as well against impairing the obligation of a contract by constitutional amendment as by legislative authority; that in the meaning of the prohibition a constitution is a law. *Dodge* v. *Woolsey*, 18 How. 331; *Railroad Co.* v. *McClure*, 10 Wall. 511; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 672; *Fisk* v. *Jefferson Police Jury*, 116 U. S. 131; *White* v. *Hart*, 13 Wall. 646; *Gunn* v. *Barry*, 15 Wall. 610; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Providence Bank* v. *Billings*, 4 Pet. 514; *Green* v. *Biddle*, 8 Wheat. 1; *Woodruff* v. *Trapnall*, 10 How. 190; *Wolff* v. *New Orleans*, 103 U. S. 358; *Poindexter* v. *Greenhow*, 114 U. S. 270, 297; *Fletcher* v. *Peck*, 6 Cranch, 87.

VI. The Supreme Court of Louisiana holds that the Constitution of 1879 deprived the courts of the State of jurisdiction to enforce the contracts of the State in relation to these bonds. To take away all remedy for the enforcement of a right is to take away the right itself. But that is not in the power of the State. *Poindexter* v. *Greenhow*, 114 U. S. 270, 303; *Brown* v. *Kinzie*, 1 How. 311, 317; *McCracken* v. *Hayward*, 2 How. 608; *Louisiana* v. *New Orleans*, 102 U. S. 203, 206; *Seibert* v. *Lewis*, 122 U. S. 284, 295. The constitutional protection of contracts is judicially enforced in suits growing out of them. *In re Ayers*, *sup.*, 504; *Carter* v. *Greenhow*, 114 U. S. 317, 322.

The State, having consented to be sued, and having made such consent a matter of contract, upon which it had obtained a loan of money, cannot withdraw its consent to the injury of the party with whom it contracted. Such withdrawal would impair its contract in violation of the Constitution of the United States. *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

*Mr. Walter H. Rogers*, Attorney General of the State of Louisiana, *Mr. M. J. Cunningham*, *Mr. B. J. Sage* and *Mr. Alexander Porter Morse*, for defendant in error, submitted on their briefs.

Mr. Justice Bradley, after stating the case as above, delivered the opinion of the court.

The question is presented, whether a State can be sued in a Circuit Court of the United States by one of its own citizens upon a suggestion that the case is one that arises under the Constitution or laws of the United States.

The ground taken is, that under the Constitution, as well as under the act of Congress passed to carry it into effect, a case is within the jurisdiction of the federal courts, without regard to the character of the parties, if it arises under the Constitution or laws of the United States, or, which is the same thing, if it necessarily involves a question under said Constitution or laws. The language relied on is that clause of the 3d article of the Constitution, which declares that "the judicial power of the United States shall extend to all cases in law and equity arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;" and the corresponding clause of the act conferring jurisdiction upon the Circuit Court, which, as found in the act of March 3, 1875, 18 Stat. 470, c. 137, § 1, is as follows, to wit: "That the Circuit Courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity, . . . arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority." It is said that these jurisdictional clauses make no exception arising from the character of the parties, and, therefore, that a State can claim no exemption from suit, if the case is really one arising under the Constitution, laws or treaties of the United States. It is conceded that where the jurisdiction depends alone upon the character of the parties, a controversy between a State and its own

citizens is not embraced within it; but it is contended that though jurisdiction does not exist on that ground, it nevertheless does exist if the case itself is one which necessarily involves a federal question; and with regard to ordinary parties this is undoubtedly true. The question now to be decided is, whether it is true where one of the parties is a State, and is sued as a defendant by one of its own citizens.

That a State cannot be sued by a citizen of another State, or of a foreign state, on the mere ground that the case is one arising under the Constitution or laws of the United States, is clearly established by the decisions of this court in several recent cases. *Louisiana* v. *Jumel*, 107 U. S. 711; *Hagood* v. *Southern*, 117 U. S. 52; *In re Ayers*, 123 U. S. 443. Those were cases arising under the Constitution of the United States, upon laws complained of as impairing the obligation of contracts, one of which was the constitutional amendment of Louisiana complained of in the present case. Relief was sought against state officers who professed to act in obedience to those laws. This court held that the suits were virtually against the States themselves and were consequently violative of the Eleventh Amendment of the Constitution, and could not be maintained. It was not denied that they presented cases arising under the Constitution; but, notwithstanding that, they were held to be prohibited by the amendment referred to.

In the present case the plaintiff in error contends that he, being a citizen of Louisiana, is not embarrassed by the obstacle of the Eleventh Amendment, inasmuch as that amendment only prohibits suits against a State which are brought by the citizens of another State, or by citizens or subjects of a foreign State. It is true, the amendment does so read: and if there were no other reason or ground for abating his suit, it might be maintainable; and then we should have this anomalous result, that in cases arising under the Constitution or laws of the United States, a State may be sued in the federal courts by its own citizens, though it cannot be sued for a like cause of action by the citizens of other States, or of a foreign state; and may be thus sued in the federal courts, although not allowing itself to be sued in its own courts. If this is the necessary

consequence of the language of the Constitution and the law, the result is no less startling and unexpected than was the original decision of this court, that under the language of the Constitution and of the judiciary act of 1789, a State was liable to be sued by a citizen of another State, or of a foreign country. That decision was made in the case of *Chisholm* v. *Georgia*, 2 Dall. 419, and created such a shock of surprise throughout the country that, at the first meeting of Congress thereafter, the Eleventh Amendment to the Constitution was almost unanimously proposed, and was in due course adopted by the legislatures of the States. This amendment, expressing the will of the ultimate sovereignty of the whole country, superior to all legislatures and all courts, actually reversed the decision of the Supreme Court. It did not in terms prohibit suits by individuals against the States, but declared that the Constitution should not be construed to import any power to authorize the bringing of such suits. The language of the amendment is that "the judicial power of the United States shall *not be construed to extend* to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State or by citizens or subjects of any foreign state." The Supreme Court had construed the judicial power as extending to such a suit, and its decision was thus overruled. The court itself so understood the effect of the amendment, for, after its adoption, Attorney General Lee, in the case of *Hollingsworth* v. *Virginia*, 3 Dall. 378, submitted this question to the court, "whether the amendment did, or did not, supersede all suits depending, as well as prevent the institution of new suits, against any one of the United States, by citizens of another State?" *Tilghman* and *Rawle* argued in the negative, contending that the jurisdiction of the court was unimpaired in relation to all suits instituted previously to the adoption of the amendment. But, on the succeeding day, the court delivered a unanimous opinion, "that the amendment being constitutionally adopted, there could not be exercised any jurisdiction, in any case, past or future, in which a State was sued by the citizens of another State, or by citizens or subjects of any foreign state."

This view of the force and meaning of the amendment is important. It shows that, on this question of the suability of the States by individuals, the highest authority of this country was in accord rather with the minority than with the majority of the court in the decision of the case of *Chisholm* v. *Georgia;* and this fact lends additional interest to the able opinion of Mr. Justice Iredell on that occasion. The other justices were more swayed by a close observance of the letter of the Constitution, without regard to former experience and usage ; and because the letter said that the judicial power shall extend to controversies "between a State and citizens of another State;" and "between a State and foreign states, citizens or subjects," they felt constrained to see in this language a power to enable the individual citizens of one State, or of a foreign state, to sue another State of the Union in the federal courts. Justice Iredell, on the contrary, contended that it was not the intention to create new and unheard of remedies, by subjecting sovereign States to actions at the suit of individuals, (which he conclusively showed was never done before,) but only, by proper legislation, to invest the federal courts with jurisdiction to hear and determine controversies and cases, between the parties designated, that were properly susceptible of litigation in courts.

Looking back from our present standpoint at the decision in *Chisholm* v. *Georgia,* we do not greatly wonder at the effect which it had upon the country. Any such power as that of authorizing the federal judiciary to entertain suits by individuals against the States, had been expressly disclaimed, and even resented, by the great defenders of the Constitution whilst it was on its trial before the American people. As some of their utterances are directly pertinent to the question now under consideration, we deem it proper to quote them.

The eighty-first number of the Federalist, written by Hamilton, has the following profound remarks :

"It has been suggested that an assignment of the public securities of one State to the citizens of another, would enable them to prosecute that State in the federal courts for the amount of those securities; a suggestion which the following considerations prove to be without foundation :

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of state sovereignty were discussed in considering the article of taxation, and need not be repeated here. A recurrence to the principles there established will satisfy us, that there is no color to pretend that the state governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting State; and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable."

The obnoxious clause to which Hamilton's argument was directed, and which was the ground of the objections which he so forcibly met, was that which declared that "the judicial power shall extend to all . . . controversies between a State and citizens of another State, . : . and between a State and foreign states, citizens or subjects." It was argued by the opponents of the Constitution that this clause would authorize jurisdiction to be given to the federal courts to entertain suits against a State brought by the citizens of another State, or of a foreign state. Adhering to the mere letter, it might be so; and so, in fact, the Supreme Court held in *Chisholm* v.

*Georgia;* but looking at the subject as Hamilton did, and as Mr. Justice Iredell did, in. the light of history and experience and the established order of things, the views of the latter were clearly right, — as the people of the United States in their sovereign capacity subsequently decided.

But Hamilton was not alone in protesting against the construction put upon the Constitution by its opponents. In the Virginia convention the same objections were raised by George Mason and Patrick Henry, and were met by Madison and Marshall as follows. Madison said : " Its jurisdiction [the federal jurisdiction] in controversies between a State and citizens of another State is much objected to, and perhaps without reason. It is not in the power of individuals to call any State into court. The only operation it can have is that, if a State should wish to bring a suit against a citizen, it must be brought before the federal court. This will give satisfaction to individuals, as it will prevent citizens on whom a State may have a claim being dissatisfied with the state courts. . . . It appears to me that this [clause] can have no operation but this — to give a citizen a right to be heard in the federal courts; and if a State should condescend to be a party, this court may take cognizance of it." 3 Elliott's Debates, 2d ed. 533. Marshall, in answer to the same objection, said: " With respect to disputes between a State and the citizens of another State, its jurisdiction has been decried with unusual vehemence. I hope that no gentleman will think that a State will be called at the bar of the federal court. . . . It is not rational to suppose that the sovereign power should be dragged before a court. The intent is to enable States to recover claims of individuals residing in other States. . . . But, say they, there will be partiality in it if a State cannot be defendant — if an individual cannot proceed to obtain judgment against a State, though he may be sued by a State. It is necessary to be so, and cannot be avoided. I see a difficulty in making a State defendant which does not prevent its being plaintiff." Ib. 555.

It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just ; and

they apply equally to the present case as to that then under discussion. The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. The reason against it is as strong in this case as it was in that. It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of. Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face.

The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the Constitution when establishing the judicial power of the United States. Some things, undoubtedly, were made justiciable which were not known as such at the common law; such, for example, as controversies between States as to boundary lines, and other questions admitting of judicial solution. And yet the case of *Penn* v. *Lord Baltimore*, 1 Ves. Sen. 444, shows that some of these unusual subjects of litigation were not unknown to the courts even in colonial times; and several cases of the same general character arose under the Articles of Confederation, and were brought before the tribunal provided for that purpose in those articles. 131 U. S. App. 1. The establishment of this new branch of jurisdiction seemed to be necessary from the extinguishment of diplomatic relations between the States. Of other controversies between a State and another State or its citizens, which, on the settled principles of public law, are not subjects of judicial cognizance, this court has often declined to take jurisdiction. See *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 288, 289, and cases there cited.

The suability of a State without its consent was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted. It was fully shown by an exhaustive examination of the old law by Mr. Justice Iredell in his opinion in *Chisholm* v. *Georgia;* and it has been conceded in every case since, where the question has, in any way, been presented, even in the cases which have gone farthest in sustaining suits against the officers or agents of States. *Osborn* v. *Bank of United States,* 9 Wheat. 738; *Davis* v. *Gray,* 16 Wall. 203; *Board of Liquidation* v. *McComb,* 92 U. S. 531 ; *United States* v. *Lee,* 106 U. S. 196 ; *Poindexter* v. *Greenhow,* 109 U. S. 63 ; *Virginia Coupon Cases,* 114 U. S. 269. In all these cases the effort was to show, and the court held, that the suits were not against the State or the United States, but against the individuals; conceding that if they had been against either the State or the United States, they could not be maintained.

Mr. Webster stated the law with precision in his letter to Baring Brothers & Co., of October 16, 1839. Works, Vol. VI, 537, 539. "The security for state loans," he said, "is the plighted faith of the State as a political community. It rests on the same basis as other contracts with established governments, the same basis, for example, as loans made by the United States under the authority of Congress; that is to say, the good faith of the government making the loan, and its ability to fulfil its engagements."

In *Briscoe* v. *Bank of Kentucky,* 11 Pet. 257, 321, Mr. Justice McLean, delivering the opinion of the court, said : "What means of enforcing payment from the State had the holder of a bill of credit? It is said by the counsel for the plaintiffs, that he could have sued the State. But was a State liable to be sued? . . . No sovereign State is liable to be sued without her consent. Under the Articles of Confederation, a State could be sued only in cases of boundary. It is believed that there is no case where a suit has been brought, at any time, on bills of credit against a State; and it is certain that no suit could have been maintained on this ground prior to the Constitution."

"It may be accepted as a point of departure unquestioned," said Mr. Justice Miller, in *Cunningham* v. *Macon & Brunswick Railroad*, 109 U. S. 446, 451, "that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution."

Undoubtedly a State may be sued by its own consent, as was the case in *Curran* v. *Arkansas et al.*, 15 How. 304, 309, and in *Clark* v. *Barnard*, 108 U. S. 436, 447. The suit in the former case was prosecuted by virtue of a state law which the legislature passed in conformity to the constitution of that state. But this court decided, in *Beers et al.* v. *Arkansas*, 20 How. 527, 529, that the State could repeal that law at any time; that it was not a contract within the terms of the constitution prohibiting the passage of state laws impairing the obligation of a contract. In that case the law allowing the State to be sued was modified, pending certain suits against the State on its bonds, so as to require the bonds to be filed in court, which was objected to as an unconstitutional change of the law. Chief Justice Taney, delivering the opinion of the court, said: "It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this privilege and permit itself to be made a defendant in a suit by individuals, or by another State. And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it. . . . The prior law was not a contract. It was an ordinary act of legislation, prescribing the conditions upon which the State consented to waive the privilege of sovereignty. It contained no stipulation that these regulations should not be modified afterwards if, upon experience, it was found that further provisions were

necessary to protect the public interest; and no such contract can be implied from the law, nor can this court inquire whether the law operated hardly or unjustly upon the parties whose suits were then pending. That was a question for the consideration of the legislature. They might have repealed the prior law altogether, and put an end to the jurisdiction of their courts in suits against the State, if they had thought proper to do so, or prescribe new conditions upon which the suits might still be allowed to proceed. In exercising this power the State violated no contract with the parties." The same doctrine was held in *Railroad Company* v. *Tennessee,* 101 U. S. 337, 339 ; *Railroad Company* v. *Alabama,* 101 U. S. 832 ; and *In re Ayers,* 123 U. S. 443, 505.

But besides the presumption that no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution — anomalous and unheard of when the Constitution was adopted — an additional reason why the jurisdiction claimed for the Circuit Court does not exist, is the language of the act of Congress by which its jurisdiction is conferred. The words are these : "The circuit courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, . . . arising under the Constitution or laws of the United States, or treaties," etc.— "Concurrent with the courts of the several States." Does not this qualification show that Congress, in legislating to carry the Constitution into effect, did not intend to invest its courts with any new and strange jurisdictions? The state courts have no power to entertain suits by individuals against a State without its consent. Then how does the Circuit Court, having only concurrent jurisdiction, acquire any such power? It is true that the same qualification existed in the judiciary act of 1789, which was before the court in *Chisholm* v. *Georgia,* and the majority of the court did not think that it was sufficient to limit the jurisdiction of the Circuit Court. Justice Iredell thought differently. In view of the manner in which that decision was received by the country, the adoption of the Eleventh Amendment, the light of history and the reason of the thing, we

think we are at liberty to prefer Justice Iredell's views in this regard.

Some reliance is placed by the plaintiff upon the observations of Chief Justice Marshall, in *Cohens* v. *Virginia,* 6 Wheat. 264, 410. The Chief Justice was there considering the power of review exercisable by this court over the judgments of a state court, wherein it might be necessary to make the State itself a defendant in error. He showed that this power was absolutely necessary in order to enable the judiciary of the United States to take cognizance of all cases arising under the Constitution and laws of the United States. He also showed that making a State a defendant in error was entirely different from suing a State in an original action in prosecution of a demand against it, and was not within the meaning of the Eleventh Amendment; that the prosecution of a writ of error against a State was not the prosecution of a suit in the sense of that amendment, which had reference to the prosecution, by suit, of claims against a State. "Where," said the Chief Justice, "a State obtains a judgment against an individual, and the court rendering such judgment overrules a defence set up under the Constitution or laws of the United States, the transfer of this record into the Supreme Court for the sole purpose of inquiring whether the judgment violates the Constitution of the United States, can, with no propriety, we think, be denominated a suit commenced or prosecuted against the State whose judgment is so far reëxamined. Nothing is demanded from the State. No claim against it of any description is asserted or prosecuted. The party is not to be restored to the possession of any thing. . . . He only asserts the constitutional right to have his defence examined by that tribunal whose province it is to construe the Constitution and laws of the Union. . . . The point of view in which this writ of error, with its citation, has been considered uniformly in the courts of the Union, has been well illustrated by a reference to the course of this court in suits instituted by the United States. The universally received opinion is that no suit can be commenced or prosecuted against the United States; that the judiciary act does not authorize such suits.

Yet writs of error, accompanied with citations, have uniformly issued for the removal of judgments in favor of the United States into a superior court. . . . It has never been suggested that such writ of error was a suit against the United States, and, therefore, not within the jurisdiction of the appellate court."

After thus showing by incontestable argument that a writ of error to a judgment recovered by a State, in which the State is necessarily the defendant in error, is not a suit commenced or prosecuted against a State in the sense of the amendment, he added, that if the court were mistaken in this, its error did not affect that case, because the writ of error therein was not prosecuted by "a citizen of another State" or "of any foreign state," and so was not affected by the amendment; but was governed by the general grant of judicial power, as extending "to all cases arising under the Constitution or laws of the United States, without respect to parties." p. 412.

It must be conceded that the last observation of the Chief Justice does favor the argument of the plaintiff. But the observation was unnecessary to the decision, and in that sense *extra judicial*, and though made by one who seldom used words without due reflection, ought not to outweigh the important considerations referred to which lead to a different conclusion. With regard to the question then before the court, it may be observed, that writs of error to judgments in favor of the crown, or of the State, had been known to the law from time immemorial; and had never been considered as exceptions to the rule, that an action does not lie against the sovereign.

To avoid misapprehension it may be proper to add that, although the obligations of a State rest for their performance upon its honor and good faith, and cannot be made the subjects of judicial cognizance unless the State consents to be sued, or comes itself into court; yet where property or rights are enjoyed under a grant or contract made by a State, they cannot wantonly be invaded. Whilst the State cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its con-

tracts, may be judicially resisted; and any law impairing the obligation of contracts under which such property or rights are held is void and powerless to affect their enjoyment.

It is not necessary that we should enter upon an examination of the reason or expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. This is fully discussed by writers on public law. It is enough for us to declare its existence. The legislative department of a State represents its polity and its will; and is called upon by the highest demands of natural and political law to preserve justice and judgment, and to hold inviolate the public obligations. Any departure from this rule, except for reasons most cogent, (of which the legislature, and not the courts, is the judge,) never fails in the end to incur the odium of the world, and to bring lasting injury upon the State itself. But to deprive the legislature of the power of judging what the honor and safety of the State may require, even at the expense of a temporary failure to discharge the public debts, would be attended with greater evils than such failure can cause.

The judgment of the Circuit Court is

*Affirmed.*

Mr. Justice Harlan concurring.

I concur with the court in holding that a suit directly against a State by one of its own citizens is not one to which the judicial power of the United States extends, unless the State itself consents to be sued. Upon this ground alone I assent to the judgment. But I cannot give my assent to many things said in the opinion. The comments made upon the decision in *Chisholm* v. *Georgia* do not meet my approval. They are not necessary to the determination of the present case. Besides, I am of opinion that the decision in that case was based upon a sound interpretation of the Constitution as that instrument then was.