In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.

A.H. Robins Company, Incorporated, Plaintiff,

v.

James Dieleuterio, Treasurer of the State of New Jersey, Robert K. Thompson, Director, Division of Taxation of the State of New Jersey, Joseph T. Deters, Treasurer of the State of Ohio, and James J. Lawrence, Tax Commissioner of the State of Ohio, Defendants.

Bankruptcy No. 85–1307–R.
Adversary No. 97–1001.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

June 21, 1999.

James C. Roberts, James S. Crockett, Jr., James M. Nolan, Mays & Valentine, Richmond, VA, for plaintiff.

Virginia W. Powell, Hunton & Williams, Riverfront Plaza, East Tower, Richmond, VA, Elise Porter, Assistant Attorney General, State Office Tower, Betty D. Montgomery, Attorney General of Ohio, Richard Farrin, Assistant Attorney General, Chief of Taxation, Columbus, OH, for Ohio defendants.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

A.H. Robins Company, Incorporated ("Robins II") initiated this adversary proceeding by filing a petition for declaratory judgment. The defendants are the Treasurer and the Director of Taxation of the State of New Jersey and the Treasurer and the Tax Commissioner of the State of Ohio. The Complaint seeks a declaration respecting certain assets to which Robins II succeeded by virtue of a reorganization plan. The defendants have moved to dismiss the action for lack of subject matter jurisdiction or, alternatively, to abstain from the exercise of jurisdiction. For the reasons set forth below, the motion to dismiss for lack of subject matter jurisdiction is granted.

## STATEMENT OF FACTS

On August 21, 1985, A.H. Robins Company, Incorporated, ("Robins I") filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. § 1001, *et seq.* At the time, Robins I was facing several thousand product liability actions throughout the United States and expected even more to be filed. Almost three years later, on July 26, 1988, the Sixth Amended and Restated Plan of Reorganization (the "Plan") was confirmed. New Jersey and Ohio were creditors of Robins I and received notice of the Plan, of the right to object to its terms and, of the hearing at which the Court considered confirmation of the Plan which resulted in the Confirmation Order by which the Plan was confirmed and put into effect. Neither State voiced any objection to the Plan or appealed the decision confirming it.

The Plan was the culmination of extensive negotiations involving Robins I, the official committees representing its creditors, the plaintiffs in the product liability

actions and the equity security holders of Robins I, as well as prospective purchasers of Robins I. The purposes of the Plan were to provide funds by which Robins I could fund a trust, known as the "Claimants' Trust," to pay the product liability claimants and to permit Robins I to be acquired by Robins II so that Robins II could continue to engage in business as the successor to all the business and assets of Robins I. Plan at ¶ 1.79.

The Plan reflects that Robin II was formed for the express purpose of effectuating the acquisition of Robins I by American Home Products Corporation ("AHP"). In that respect, the formation of a merger subsidiary, *i.e.*, Robins II, was essential to limit the liability of AHP; and, without that limitation of liability, the reorganization of Robins I would have been impossible and there would have been no funding for the Claimants' Trust. The merger qualified as a tax-free reorganization under Section 368(a)(1)(G) and Section 368(a)(2)(B) of the Internal Revenue Code. The merger was consummated on December 15, 1989 with the payment by AHP of $2.475 billion.

The Confirmation Order which approved the Plan and consummated the reorganization provides, *inter alia*, that:

The *transfers of property by Robins to the Successor Corporation* (i) are or will be legal, valid and effective transfers of property; (ii) *vest or will vest the Successor Corporation with good title* to such property free and clear of all liens, charges, claims, encumbrances, or interests, except as expressly provided in the Plan; (iii) do not and will not constitute fraudulent transfers or conveyances under the Code or under the laws of the United States, any State, territory, possession or the District of Columbia; and (iv) do not and will *not subject the Successor Corporation* or its Affiliates *to any liability by reason of such transfer under the laws* of the United States, *any State*, territory or possession thereof, or the District of Columbia based, *in whole or in part, directly or indirectly, on any theory of law,* including, without limitation, any theory of successor or transferee liability.

Confirm. Ord. at ¶ 13 (emphasis added).

Robins II succeeded to and was entitled to the benefits of, the property of the estate of Robins I. Plan at ¶¶ 1.79; 6.03. Among the property of the estate of Robins I to which Robins II succeeded was the net operating loss ("NOL") of Robins I and such rights to use and benefit from the NOL as Robins I would have had. The NOL was attributable principally to the funding of the Claimants' Trust.

The amount of NOL claimed by Robins II on its federal tax return for the taxable year ended December 1989 was $1,732,-718,240. After the confirmation of the Plan, Robins II and certain of its affiliates timely filed corporate income tax and franchise tax returns with the State of Ohio and the State of New Jersey. In both instances, the tax returns were audited and each State disallowed some or all of the NOL deduction and thereupon issued tax assessments against Robins II. Thereafter, Robins II paid the assessments, which totaled $19,800,000 and applied for income and franchise tax refunds in that amount.

Subsequently, the New Jersey Director of Taxation determined that Robins II was not entitled to use the NOL of Robins I because Robins II was not the actual corporation that sustained the losses reflected in the NOL and thereupon denied the request for refund which had been filed with the State of New Jersey by Robins II. That decision is on appeal to the Tax Court of the State of New Jersey.

In like fashion, the Ohio Tax Commissioner denied the claim of Robins II for a refund, concluding that Robins II was not entitled to the NOL of Robins I because Robins I was not a taxpayer during the relevant taxable year. The decision of the Ohio Tax Commissioner is on appeal in the State court.

Confronted with what it perceived as the abridgement of the fundamental principles by which Robins II had paid $2.475 billion to permit the funding of the Claimants Trust and an affront to the order of this Court, Robins filed this declaratory judgment action. In it, Robins II seeks "an order in furtherance of the confirmed Plan declaring that Robins II is entitled to the full use and benefit of the NOL of Robins I and granting such other and further relief as the Court deems just and proper." Comp. at p. 6.

The defendants seek dismissal of the action pursuant to Fed.R.Civ.P. 12(b)(1) for the reason that the Court lacks subject matter jurisdiction in this action by virtue of the sovereign immunity conferred upon the States of Ohio and New Jersey pursuant to the Eleventh Amendment to the Constitution of the United States. The defendants also assert that the Court lacks jurisdiction in this action because of the Tax Injunction Act, 28 U.S.C. §§ 1341, 1334(b). Alternatively, the defendants move the Court to abstain from an exercise of subject matter jurisdiction herein if it is found to exist.

### DISCUSSION

■ The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend XI.

The text of the Eleventh Amendment ostensibly restricts the diversity jurisdiction of federal courts, but the Supreme Court of the United States has " 'understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (citing *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578,

115 L.Ed.2d 686 (1991)). That presupposition, first articulated in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), "has two parts: first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.' " *Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. 1114 (citing *Hans,* 134 U.S. at 13, 10 S.Ct. 504).

■ Of course, in certain limited circumstances, Congress may abrogate the Eleventh Amendment immunity and provide for suit against a sovereign State even absent its consent. To ascertain whether, in a federal statute, Congress has abrogated the sovereign immunity of the state, courts are to consider first whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Second, it is necessary to determine whether Congress acted "pursuant to a valid exercise of power." *Id.*

■ Those inquiries are to be informed by the precept that "the relief sought by a plaintiff suing a State is irrelevant to the question of whether the suit is barred by the Eleventh Amendment." *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. 1114 (citing *Cory v. White,* 457 U.S. 85, 90, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982)). A corollary principle is that the "type of relief sought is irrelevant to whether Congress has power to abrogate States" immunity. *Id.* This is because

> The *Eleventh Amendment* does not exist solely in order to "preven[t] federal court judgments that must be paid out of a State's treasury," ... it also *serves to avoid "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties* ...."

*Id.* (citations and internal quotation marks omitted) (emphasis added).

■ Applying the decision in *Seminole Tribe* and the fundamental precepts which guide its application to the Bankruptcy Code, the United States Court of Appeals for the Fourth Circuit held that Section 106 of the Bankruptcy Code[1] which, in clear terms, abrogates the sovereign immunity of the States, was unconstitutional. *Schlossberg v. Maryland,* 119 F.3d 1140 (4th Cir.1997);[2] *see also In re Herbert M. Collins,* 1999 WL 18300 (4th Cir.1999); *Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir.1997). Robins II acknowledges, as it must, the binding nature of these controlling authorities. However, Robins II argues that the decisions are inapplicable here because this declaratory judgment action is not a suit against a State. Rather, according to Robins II, "[t]he present action involves an interpretation of the Plan and the Confirmation Order and a declaration of the rights of Robins II thereunder. It does not seek, implicitly or explicitly, any affirmative or monetary relief against the States." Robins II's OBJECTION AND MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS at p. 17 (hereafter "Robins Brief at ＿＿＿＿＿＿").

Moreover, according to Robins II, this action simply requests interpretation of the Plan and the Court's Confirmation Order to make certain that Robins II has the "full use and benefit of the NOL of Robins I." Comp. at p. 6. In that respect, Robins II argues that New Jersey and Ohio, as creditors of Robins I, were given notice of the Plan, did not object to it and did not appeal the Confirmation Order once it was issued. Hence, Robins II sees this action as one by which the Court interprets and protects its own order from collateral attack by the States in the decisions of their taxing authorities.

Recent decisions in the circuit and this court lend support to the arguments made by Robins II. First, in *Antonelli,* the Fourth Circuit precluded claims of certain taxing authorities because they: (1) had knowledge of the plan which exempted the debtor's estate from certain taxes; (2) had the choice and opportunity (a) to object to the plan and the Bankruptcy Court's confirmation order or (b) to appeal it to the district court; and (3) pursued neither course. *Antonelli,* 123 F.3d at 782. The Court of Appeals, therefore, precluded the efforts of the taxing authorities to challenge the plan collaterally in suits brought by the taxing authorities in state court and subsequently removed to federal court. In that respect, the Fourth Circuit held that:

> Each of the Taxing Authorities received a copy of the proposed reorganization plan, which included the now-contested paragraph 9.5. While the plan and related documents were concededly complex because of the size of the estate and the number of projects and creditors involved—making it understandable that the Taxing Authorities might not want to sift through all of the information provided—that fact does not make the information that was provided insufficient. On the contrary, the notice given provided explicitly that the transfers both from the debtors to the Liquidating Trust and from the trust to third-party purchasers would not be taxable.

> \*   \*   \*   \*   \*   \*

> In short, the Taxing Authorities ... had sufficient notice of both the plan and the order confirming it to put them on legal notice of the plan's tax exempt provisions. Having received that notice and failed to present any objection, they are

---

1.  11 U.S.C. § 106.

2.  In *Schlossberg,* the Court of Appeals held that:

> Because the holding in *Seminole* extended to restrict all federal jurisdiction over the

states based on Article I Powers, we hold in this case that Congress has no authority under the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4, to abrogate state sovereign immunity in federal courts.

*Id.* at 1145.

now barred from collaterally attacking the bankruptcy court's order.

*Id.* at 783.

On the merits of Robins II's position, that language, considered in perspective of the supremacy clause of the Constitution, might well foreclose New Jersey and Ohio from attacking in any collateral proceedings in any court any findings made in the bankruptcy proceedings. As the Court of Appeals held in *Antonelli* :

> It is true that if a state wishes to challenge a bankruptcy court order of which it receives notice, it will have to submit to federal jurisdiction.... The state, of course, may well choose not to appear in federal court. But that choice carries with it the consequence of foregoing any challenge to the federal court's actions. While forcing a state to make such a choice may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment. Instead, it is the result of Congress' constitutionally authorized legislative power to make federal courts the exclusive venue for administering the bankruptcy law.

*Antonelli,* 123 F.3d at 787. (relying on *New York v. Irving Trust Co.,* 288 U.S. 329, 333, 53 S.Ct. 389, 77 L.Ed. 815 (1933) ("the federal government possesses supreme power in respect of bankruptcies. If a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power; otherwise, orderly and expeditious proceedings would be impossible and the fundamental purpose of the Bankruptcy [Code] would be frustrated")).

From these authorities, Robins II weaves the argument that this adversary proceeding which names the tax officials of two states as defendants is not barred by the Eleventh Amendment. In the corollary argument, Robins II argues that *Antonelli* teaches that, because bankruptcy courts are supreme in the area, an adversary proceeding naming officials of States as defendants are not suits within the meaning of the Eleventh Amendment.

It is true that, in *Antonelli,* the Court of Appeals rejected the Eleventh Amendment sovereign immunity argument advanced by the State taxing authorities. However, it did so because the root decision of the Bankruptcy Court, which the States sought to attack collaterally by an action which they initiated in state court arose out of a Confirmation Order entered in a bankruptcy proceeding—not in an adversary proceeding. In that regard, the Court of Appeals held that:

> The *confirmation order* in this case was *not entered in a suit "against one of the United States" filed by a private party.* The *state* was *not named a defendant, nor was it served with process mandating that it appear* in federal court. While it was *served with notice* of the proposed plan and its confirmation, it was *free to enter federal court voluntarily or to refrain from doing so.* This is to be *distinguished* from the case in which a debtor, a trustee or other private person *files an adversary action* against the state in the bankruptcy court, *causing* the bankruptcy court to issue *process* summoning the state to appear. *Such an adversary proceeding would be a suit* "prosecuted against one of the United States" and adjudication of that suit would depend on the court's jurisdiction over the state, implicating the Eleventh Amendment's limitation on federal power.'

*Id.* at 786–87 (citing *Schlossberg,* 119 F.3d at 1148) (emphasis added). Thus, in both *Schlossberg* and *Antonelli,* the Court of Appeals held that adversary proceedings filed by the debtor or the trustee were suits against the United States because the State or its representative was a named party and the court had issued compulsory process which summoned the State to appear.

More recently, the distinction between the circumstances of *Schlossberg* and *Antonelli* were explained by the Court of Appeals to underscore the importance of those factors in ascertaining whether proceedings in bankruptcy courts are suits within the meaning of the Eleventh Amendment. *In re Herbert M. Collins*, 173 F.3d 924 (4th Cir.1999). There, the debtor, Collins, was released in bankruptcy from all legally dischargeable debts. Thereafter, Virginia sought to collect on pre-bankruptcy judgments on forfeited bail bonds. After giving notice to Virginia, the debtor moved to reopen the bankruptcy case for a determination that the pre-bankruptcy judgment debt on the forfeited bail bonds was dischargeable. Virginia interposed a claim of sovereign immunity and the Court of Appeals rejected it. Finding that *Antonelli*, rather than *Schlossberg*, was controlling, the Court held that the motion to reopen the bankruptcy was not a suit against Virginia just as the plan confirmation proceeding in *Antonelli* was not a suit against Maryland in that case. *Id.* at 780–81. In so doing, the Fourth Circuit noted that "[a]n adversary proceeding, with its compulsory process, is not required to reopen the case because the bankruptcy court's power to reopen flows from its jurisdiction over debtors and their estates.... A motion to reopen may be filed by 'the debtor or other party in interest.'" *Id.* (relying on *Antonelli*, 123 F.3d at 787).

The court then observed that the motion to reopen was served by mail upon Virginia but explained that "[t]he Commonwealth, however, was not named as a defendant, was not served with process, and was not compelled to appear in the bankruptcy court. The Commonwealth was free to respond to the motion or ignore it. In these circumstances, the motion to reopen was not a suit 'against one of the United States within the meaning of the Eleventh Amendment.'" *Id.* (relying on *Antonelli*, 123 F.3d at 787).

Later in the same decision, the Fourth Circuit rejected Virginia's argument that "when the bankruptcy court determined dischargeability in connection with the motion to reopen it transformed the case into a suit against the Commonwealth in violation of the Eleventh Amendment." *Id.* at 782–83. The reason for rejecting that argument is significant here. Specifically, the Court of Appeals held that:

This was not an adversary proceeding *because there was no action to compel the Commonwealth to come into court.* The court did *not issue any process summonsing the Commonwealth to appear.* While the Commonwealth was *served with notice of the motion to reopen, it was free to stay away* from bankruptcy court *or to appear* for the hearing. We recognize that this put the Commonwealth in a tough spot. It could decline to appear and thereby forego the opportunity to make its argument and challenge any decision. On the other hand, it could voluntarily submit to federal jurisdiction and take part in the proceedings. Forcing the Commonwealth to make such a choice "does not amount to the exercise of federal judicial power to hail a state into federal court against its will and in violation of the Eleventh Amendment." *Antonelli*, 123 F.3d at 787. Again, the Commonwealth *was not summonsed* to appear in the proceedings brought on *by the* Collinses' *motion to reopen.* Moreover, the *bankruptcy court did not need to assert jurisdiction over the Commonwealth to determine the dischargeability* of the bail bond debt in conjunction with its decision to reopen. The court had the power to do that because it *had jurisdiction over the debtors and their case.* *Id.* at 783–84 (emphasis added).

A decision of a member of this Court in *Clerk of the Circuit Court of Anne Arundel County, Maryland v. NVR Homes, Inc.*, 222 B.R. 514 (E.D.Va.1998) illustrates the same principles. There, the debtor initiated a contested matter requesting the bankruptcy court to declare that certain transfers were exempt from taxation. The

bankruptcy court, applying *Seminole Tribe*, sustained the State's plea of sovereign immunity. The district court reversed, holding that:

> A review of this contested matter, *i.e.*, NVR's motion for a declaration that its real property transfers were exempt from taxation, reveals that the proceeding lacked the fundamental attributes that commonly identify a "suit." Specifically, *none of the Taxing Authorities were named as defendants, nor were they served with process* mandating that they appear in a federal court.

*Id.* at 520 (emphasis added).

▮▮▮ Read together, *Schlossberg, Antonelli, Collins* and *NVR* teach that where a State or its official is named as a defendant (in his official capacity) and is served with process, there is "a suit" within the meaning of the Eleventh Amendment. And, as the Supreme Court made clear in *Seminole Tribe*, one fundamental aspect of sovereign immunity is that the Eleventh Amendment "serves to avoid 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Seminole Tribe*, 517 U.S. at 57, 116 S.Ct. 1114. That is precisely what has occurred here and under the rule in *Seminole Tribe*, as explicated in *Schlossberg, Antonelli, Collins* and *NVR*, the Eleventh Amendment precludes the exercise of federal jurisdiction here.

▮▮▮ Robins II argues that its complaint for declaratory relief is fundamentally the same as a motion to interpret the Confirmation Order and the Plan and that, therefore, this declaratory judgment action is not a suit. Of course, as Robins II argues, it would elevate form over substance to allow the title of the pleading alone to determine whether there is a suit within the meaning of the Eleventh Amendment. However, it is not the denomination of the pleading as a complaint that renders this declaratory judgment action a suit within the meaning of the Eleventh Amendment. Rather, that result obtains because officials of the States are named as defendants and because they have been served with process summonsing them into court in their official capacities. Therefore this adversary proceeding possesses the attributes of a suit within the meaning of the Eleventh Amendment for the same reasons as did the adversary proceeding in *Schlossberg*.[3]

## CONCLUSION

For the foregoing reasons, the Court lacks subject matter jurisdiction over this adversary proceeding and it is dismissed without prejudice.[4]

The Clerk is directed to send a copy of the foregoing Memorandum Opinion to all counsel of record by facsimile and mail.

It is so ORDERED.

---

**3.** It is of no moment that Robins II may be correct in its interpretation of the Plan. The merits of the case are not to be used as struts to support jurisdiction where none otherwise exists. Nor is Robins II left without recourse. If it is otherwise permissible under the provisions of the Bankruptcy Code, this court has retained jurisdiction over the bankruptcy proceedings and can consider any proper motion brought before it in which the officials of a State are not served with process or compelled to appear and submit to the jurisdiction of the federal court. In like fashion, the fundamental argument which Robins II appears to advance—that the supremacy clause of the United States Constitution precludes a state taxing authority from altering or challenging the provisions and terms of a properly approved confirmation plan in which the state had notice—may be raised in the state proceedings involving the tax issues. Of course, the constitutional issue thusly presented may be reviewed by the Supreme Court of the United States. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**4.** Having concluded that there is a lack of subject matter jurisdiction, it is unnecessary to address the issues raised by the arguments under the Tax Injunction Act and the abstention doctrines.