In re Norma Y. JAMES.

Civ. A. No. 90–3807.

United States District Court,
E.D. Pennsylvania.

Oct. 23, 1990.
As Amended Oct. 25, 1990.

Berneter Mallory, Mallory & Assoc., Philadelphia, Pa., Steven L. Scher, Deputy Atty. Gen., Trenton, N.J., James J. O'Connell, U.S. Asst. Trustee, Philadelphia, Pa., for debtor.

Carol Momjiam, Deputy Atty. Gen. of Pennsylvania, Steven Raslavich, Trustee, Siverman Markowitz, Meo & Raslavich, Philadelphia, Pa., for defendants.

### MEMORANDUM

GILES, District Judge.

Appeal is taken by defendants, executive branch officials of the State of New Jersey ("the State"), namely, Jacqueline Draper and Robert T. Winter, both of the Department of Law and Public Safety, Division of Criminal Justice, and Peter N. Perretti, Jr., Attorney General ("the State Defendants"), from a final order of the bankruptcy court administering a Chapter 7 proceeding. Jurisdiction in this court is founded upon 28 U.S.C. § 158.

The bankruptcy court ruled that the Chapter 7 filing by plaintiff-debtor Norma Y. James ("the Debtor") triggered an automatic stay of the State's civil forfeiture proceeding, that the State had no legitimate interest in $7,990 seized from the Debtor, and that the funds must, therefore, be turned over to Debtor's Trustee. Because the State Defendants' arguments in support of the appeal turn solely on questions of law, this court's review is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–03 (3d Cir.1981).

### FACTUAL AND PROCEDURAL BACKGROUND

On March 2, 1988, several New Jersey state troopers stopped a car, apparently for speeding. The car, en route to New York City, was driven by Patrick Brown but belonged to Debtor. Neither Brown nor the other passenger in the car had a valid driver's license. The officers sought, and were granted, consent to search the car. Therein they discovered a duffle bag, in which was found a yellow plastic bag. The plastic bag contained eight bundles of currency: $1,000 in each of seven bundles and $990 in the eighth. Brown and his passenger, along with the car and the money, were taken to a local police station. There, a trained narcotics detection dog "alerted" to something in the currency, indicating that it, or some part of it, possessed the odor of an unidentified, and possibly, controlled substance. However, the criminal investigation uncovered no independent evidence of illegal drugs or of a drug transaction involving the money. No drug-related criminal charges were lodged against Brown, his passenger, or the Debtor, and the car was returned to the Debtor.

While initially claiming to own all of the money, Brown later told the police that only $2500 of the money was his and that $5500 had been borrowed from the Debtor. The police decided to retain the seized currency as related to an illegal drug transaction, ostensibly based on the police dog reaction to the money, the inconsistencies in Brown's statements, and the manner in which the currency was packaged.

The State Defendants instituted a civil forfeiture action against the money on May 31, 1988, allegedly pursuant to N.J.S. 2C:64–1 ("§ 2C:64–1"), which reads:

a. Any interest in the following shall be subject to forfeiture and no property right shall exist in them:

(1) Controlled dangerous substances, firearms which are unlawfully possessed, carried, acquired or used, illegally possessed gambling devices and untaxed cigarettes. These shall be designated prima facie contraband.

(2) All property which has been, or is intended to be, utilized in furtherance of an unlawful activity, including, but not limited to, conveyances intended to facilitate the perpetration of illegal acts, or buildings or premises maintained for the purpose of committing offenses against the State.

(3) Property which has become or is intended to become an integral part of illegal activity, including, but not limited to, money which is earmarked for use as financing for an illegal gambling enterprise.

(4) Proceeds of illegal activities, including, but not limited to, property or money obtained as a result of the sale of prima facie contraband as defined by subsection a.(1), proceeds of illegal gambling, prostitution, bribery and extortion.

b. Any article subject to forfeiture under this chapter may be seized by the State or any law enforcement officer as evidence pending a criminal prosecution pursuant to section 2C:64–4 or, when no criminal proceeding is instituted, upon process issued by any court of competent jurisdiction over the property, except that seizure without such process may be made when not inconsistent with the Constitution of this State or the United States, and when

(1) The article is prima facie contraband; or,

(2) The property subject to seizure poses an immediate threat to the public health, safety, or welfare.

The State Defendants proffered no independent evidence during the course of the forfeiture action to show that the money had been used in, or was received pursuant to, an illegal drug or other criminal transaction.

The Debtor, as a potential claimant, was served notice of the forfeiture action, but failed to respond within the State's prescribed time period. The Debtor obtained counsel, who was able to reach an agreement with the state attorney to continue the matter. Through her attorney, Debtor claimed full ownership of the funds, which she claims to have lent to Brown so that he could transfer them to her business partner in New York toward the purchase of a restaurant. Brown made no claims to the money in the forfeiture proceeding. The Debtor's counsel failed, however, to file the agreed upon pleading, apparently due to the Debtor's inability to pay the attorney's fee. The State Defendants then filed a motion seeking a default judgment based upon the pleadings.

On July 18, 1989, the Debtor received notice that a default judgment hearing would be held on July 21. The Debtor filed for bankruptcy on July 19 and claims to have left a message informing the state attorney of that fact the same day. The state attorney claims to have had no knowledge of the filing until July 21, sometime after the default judgment had been entered. The bankruptcy court credited the state attorney's testimony on this point.

On September 21, 1989, the Debtor filed a complaint alleging that the State Defendants stood in violation of 11 U.S.C. § 362 ("§ 362"), the automatic stay provision of the bankruptcy code ("Code"). The Debtor sought an order under 11 U.S.C. § 542 ("§ 542"), the Code's turnover provision, directing the State Defendants to turn the

disputed $7,990 over to her Trustee. The State Defendants filed an answer and a motion to dismiss on jurisdictional grounds. The bankruptcy court held a hearing on January 11, 1990, and subsequently requested post-trial briefs from the parties as well as a statement of the position of the Trustee. The Trustee, apparently misreading the Debtor's brief, stated that, since the default judgment had been entered prior to the onset of bankruptcy proceedings, the Debtor's chances for recovery were slim.

The bankruptcy court entered a provisional order on March 13, 1990. In that order the court denied the State Defendants' motion to dismiss, vacated the New Jersey state court default judgment, directed the Debtor to join the Trustee as a necessary plaintiff, and set April 5 as the date for a supplemental hearing, after which the ultimate disposition of the funds would be determined. On March 23, the State Defendants filed an interlocutory appeal. This district court heard oral argument on the appeal and on April 11 dismissed it without prejudice because the State Defendants proferred no evidence of an illegal drug or other criminal transaction related to the Brown arrest, although they were invited to do so.

The supplemental hearing was rescheduled for and held on April 26. Only the Debtor testified. The bankruptcy court found that, despite earlier averments to the contrary, the State Defendants had no evidence to indicate that the seized funds were received by the Debtor pursuant to criminal activity. The only putative evidence of criminality was the fact that a police dog alerted to the seized currency. Neither the Debtor nor any of those in the Debtor's car had been charged with any criminal offense related to the seized funds.

Thus, the bankruptcy court ruled that, *ab initio*, the State had had no ground on which to pursue forfeiture. Subsequent to the hearing, the bankruptcy court entered its final order of May 1, 1990. The court below ruled in favor of the Debtor on her § 362 and § 542 claims and ordered the

State Defendants to turn over the seized funds to the Debtor's Trustee. The court also ordered the parties to agree upon reasonable attorney's fees and costs to be awarded the Debtor pursuant to 11 U.S.C. § 362(h) ("§ 362(h)"). The State Defendants appeal that decision in its entirety.

For the reasons that follow, the final order of the bankruptcy court is affirmed in all respects, except for the award of attorney's fees.

## DISCUSSION

### I. JOINDER OF THE TRUSTEE AS PLAINTIFF IS A PROPER MEANS OF REMEDYING THE DEBTOR'S LACK OF STANDING.

The State Defendants argue that the Debtor lacks standing to bring this action and that it should be dismissed. While the Debtor does lack standing, dismissal is not required. Joinder of the Trustee as a necessary plaintiff is a proper means of remedying the jurisdictional defect. The court below did not err in requiring joinder.

■ The starting point of analysis is 11 U.S.C. § 541(a) ("§ 541(a)"), which lists various interests included in a debtor's estate. Included are all causes of action held by the debtor upon filing for bankruptcy. *Cain v. Hyatt*, 101 B.R. 440 (Bankr.E.D.Pa. 1989), and cases cited therein; 4 COLLIER ON BANKRUPTCY, ¶ 541.10, at 541–65 (15th ed. 1989). Causes of action against a government body, such as the Debtor's present claim to recover the seized $7,990, are included. 4 COLLIER, *supra*, ¶ 541.1, at 541–69.

■ The Debtor's claim against the State of New Jersey is to be pursued exclusively by her Trustee, who is granted the "capacity to sue and be sued" on behalf of the estate by 11 U.S.C. § 323(b). The third circuit had occasion to apply this provision in *Hanover Insurance Company v. Tyco Industries, Inc.*, 500 F.2d 654, 656–57 (3d Cir.1974), where it stated:

On his appointment, the Trustee was vested with title to all of [debtor's] property, including insurance policies and rights of action arising under them. Not

only did the Trustee hold title to [debtor's] assets; he was authorized, exclusively, to bring actions that could have been instituted by the bankrupt for the aggregation of assets and for the protection of creditors.

Therefore, the Trustee must pursue what was initially the Debtor's claim against the State, if anyone is to do so.

However, courts have the power to join or substitute a party plaintiff "[i]n case of any transfer of interest", such as the transfer of interest effected upon the filing of bankruptcy and appointment of a trustee. Fed.R.Civ.P. 25(c). In *Bauer v. Commerce Union Bank, Clarksville, Tenn.*, 859 F.2d 438 (6th Cir.1988), the sixth circuit relied on Rule 25(c) to substitute the debtor's trustee as the party plaintiff instead of dismissing the debtor's claim. Other courts have ruled that a debtor's claim should not be dismissed despite lack of standing to sue, and that the trustee, as the real party in interest, should be joined or substituted as party plaintiff. *Cain v. Hyatt*, 101 B.R. 440 (Bankr.E.D.Pa.1989); *Nagle v. Commercial Credit Business Loans, Inc.*, 102 F.R.D. 27 (E.D.Pa.1983).

■■■■ This court is unwilling to allow a trustee effectively to abandon a legitimate claim without officially abandoning it, which, pursuant to 11 U.S.C. § 554(b), cannot be done without court approval. If the Trustee here did officially abandon this cause of action, it would revert to and become a property interest of the Debtor, who could then pursue the action on her own. *In re Bennett*, 13 B.R. 643 (Bankr. W.D.Mich.1981). A trustee is not endowed with complete discretion. The court is empowered to act to effect justice concerning the disposition of an estate's property interests. *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 500–05, 106 S.Ct. 755, 758–62, 88 L.Ed.2d 859 (1986); *Bryson v. Bank of New York*, 584 F.Supp. 1306, 1316 (S.D.N.Y.1984). This is especially true when the disposition of a legitimate claim is hindered only by a minor jurisdictional defect easily cured by joinder of a party plaintiff.

■■■ The Debtor's lack of standing is based in procedure rather than in substance. She meets the substantive, constitutional test for standing: she alleges injury in fact—the deprivation of a sum specific of money—and her legal interest squarely falls "within the zone of interests to be protected or regulated by the statute[s] ... in question," namely, §§ 362 and 542. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Procedurally, the court is duly authorized to join or substitute the Trustee as party plaintiff pursuant to Fed.R.Civ.P. 25(c). Indeed, Fed.R.Civ.P. 17(a) encourages such action by stating:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

In light of Rules 25(c) and 17(a), and given the underlying legitimacy of the Debtor's claim against the State Defendants, the bankruptcy court acted properly in denying the motion to dismiss and in joining the Trustee as a necessary plaintiff.

## II. THE BANKRUPTCY COURT HAD JURISDICTION UNDER 28 U.S.C. § 157 TO RULE ON THE DEBTOR'S STAY PETITION AND TURNOVER CLAIM.

The district court may refer to the bankruptcy court "any or all proceedings arising under title 11." 28 U.S.C. § 157(a) ("§ 157(a)"). The Debtor filed for relief under Chapter 7 of the bankruptcy code, 11 U.S.C. §§ 701–766, and the district court referred her case to the bankruptcy court. Section 157(a) also grants bankruptcy courts jurisdiction over all claims "arising in or related to a case under title 11." The jurisdictional question, then, is whether the

Debtor's claims [1] against the State "arise[ ] in or relate[ ] to" her bankruptcy action. The Debtor asserts two claims: that the State Defendants violated § 362, the automatic stay provision of the bankruptcy code, by proceeding to a default judgment (the "stay" claim), and that the State is not entitled to the money seized under New Jersey's forfeiture statute but must instead turn it over to the Trustee pursuant to § 542 (the "turnover" claim).

■ While the Debtor's claims do not arise in her bankruptcy action, they are definitely related. The third circuit articulated the test for relatedness in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) (emphasis in original):

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy....* An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

This holding was reaffirmed in *In re Bobroff*, 766 F.2d 797, 802 (3d Cir.1985). Both the stay and turnover claims meet *Pacor's* relatedness test. If the Debtor prevails on these claims, then the State Defendants will have to turn over the seized funds. These determinations will affect the Debtor's "options" and "freedom of action" and will "impact[ ] upon the handling and administration of the bankruptcy estate." *Pacor*, 743 F.2d at 994.

■ The next question concerns the degree of jurisdiction the bankruptcy court may exercise. Pursuant to § 157(b)(1), bankruptcy courts may hear and determine all claims which are deemed to be core proceedings. A bankruptcy court may hear non-core proceedings, but that court must then refer its proposed findings of fact and conclusions of law to the district court. Only the district court can enter final orders or judgments in non-core proceedings.[2] § 157(c)(1).

■ Section 157(b)(2) provides a non-exclusive list of core proceedings. Among the proceedings listed are "motions to terminate, annul, or modify the automatic stay." § 157(b)(2)(G). Likewise, motions to *enforce* the automatic stay are core proceedings. The automatic stay provision is central to the administration of bankruptcy suits as it represents "one of the fundamental debtor protections provided by the bankruptcy laws." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.Code & Ad.News 5787, 5963, 6296. Thus, bankruptcy courts may rule on alleged violations of the automatic stay provision. *In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808 (Bankr.E.D.Pa.), *aff'd and remanded for clarification*, 108 B.R. 482 (E.D.Pa.1989); *In re Stephen W. Grosse, P.C.*, 84 B.R. 377 (Bankr.E.D.Pa.), *aff'd*, 96 B.R. 29 (E.D.Pa.1988), *aff'd*, 879 F.2d 856 (3d Cir.1989).

In regard to the Debtor's turnover claim, § 157(b)(2)(E) lists as among core proceedings "orders to turn over property of the estate." If it is determined that the seized funds were not subject to forfeiture, then the State Defendants must turn the seized funds over to the Trustee as property of the estate. Thus, the Debtor's forfeiture-based turnover claim fits squarely within the ambit of § 157(b)(2). The core nature of such a claim was implicitly recognized in *In re Reid*, 60 B.R. 301 (Bankr.D.Md.1986), where, as part of the administration of the debtor's estate, the bankruptcy court held a hearing to determine the forfeitability of

---

1. Technically, the claims against the State belong to the estate of the Debtor rather than to the Debtor herself. *See supra* Section I. To simplify, however, this court shall refer to the claims as belonging to the Debtor, who does retain an equitable interest in the funds and in the claim to retrieve them from the State.

2. The question whether the turnover claim is a core proceeding is not crucial given the current posture of this case. On appeal, this court has accorded plenary review to the bankruptcy court's ruling. The situation would be no different if the turnover claim were determined to be a non-core proceeding.

funds seized under Maryland's forfeiture statute. Likewise, in *In re Ryan*, 32 B.R. 794 (Bankr.D.Md.1983), the court implicitly recognized that forfeiture-based turnover claims are core proceedings when it concluded that it had the power to hold a forfeiture hearing in the course of a turnover action if it so chose.[3]

## III. THE STATE HAS NO POSSESSORY INTEREST IN THE SEIZED CURRENCY.

The State Defendants do not contest the fact that the Debtor's stay and turnover claims are core proceedings within the meaning of § 157. The State Defendants do, however, aver other jurisdictional arguments to the effect that the bankruptcy court cannot order a turnover of State-seized funds. Implicit, however, in each of the State Defendants' arguments is the assumption that the seizure of the money complied with the State's own forfeiture statute, and that the State thereby gained a possessory interest. The facts demonstrate, however, that under the state statute, the State obtained no possessory interest. On its face, the forfeiture statute requires that the money be shown to have been used in a drug or other criminal transaction. Because there was no drug transaction involved, seizure of funds was unjustified. Under such circumstances, seizure of United States currency violates the supremacy clause of the United States Constitution by infringing on Congress' power to regulate legal tender, and also violates the due process rights of the Debtor. Accordingly, each of the State Defendants' jurisdictional arguments falls of its own weight.

Section 2C:64–1 describes property subject to forfeiture under New Jersey law. *See supra* at 806. New Jersey courts have stated that "[w]hile the forfeiture statute has 'an extraordinarily broad scope,' forfeitures are disfavored in the law, and the statute should be strictly construed 'in a manner as favorable to the person whose property is to be seized as is consistent

with the fair principles of interpretation.'" *State of New Jersey v. One 1979 Chevrolet Camaro*, 202 N.J.Super. 222, 494 A.2d 816, 820 (1985) (cites omitted). In its efforts to seize currency, the state will succeed where "the funds [are] shown either directly or circumstantially to be exclusively the proceeds of or intended for an illegal transaction." *State of New Jersey v. One 1978 Ford Van*, 218 N.J.Super. 374, 527 A.2d 935, 937 (1987). Moreover, the *Ford Van* court made it clear that a state can only seize that sum of money which is specifically proved tainted, and not any cash which happens merely to be found in proximity to criminal activity. Thus, the New Jersey courts have been careful to interpret the forfeiture statute, as it requires by its terms, consistent with the Constitution of the United States, to which it defers.

The only facts offered by the State Defendants to support the forfeiture proceeding is the positive reaction given to the money by a trained police dog. That reaction, however, reveals nothing about (1) the specific identity of the detected odor; (2) the amount of currency tainted with the unidentified odor; (3) the time at which the currency acquired that odor; or (4) the circumstances under which the money acquired that odor. A possessor of United States currency can fold it, hold it, and even hide it under a mattress or in plastic bags without violating state or federal criminal laws. One can choose to keep it in any series or denominations and, in the absence of criminal conduct, one does not have to prove the chain of custody from the time of the currency's printing. Nor does the possessor have to wash the money before receiving or using it. The mere fact that currency may contain the scent of an illegal drug cannot constitutionally visit criminal responsibility upon the possessor. While such facts might give rise to suspicion warranting further investigation, they cannot on their own constitute probable

---

**3.** The *Ryan II* court decided not to try the forfeiture claim, but not because it did not have the authority to do so. Rather, pursuant to § 157(d), it ruled that it would lift the automatic stay and allow the claim to proceed in state court. *See infra* Section V(C).

cause to confiscate property or to arrest for involvement in a drug transaction.

▮ The State Defendants' interpretation and application of the forfeiture statute, therefore, places an impermissible burden upon the federal government's power to back its legal tender. Congress is authorized to issue and to circulate bills and notes based on the credit clause [4] and the necessary and proper clause [5] of the United States Constitution. Congress has the corollary power to endow those bills and notes with the quality of being legal tender for the payment of private debts. *Legal Tender Cases*, 110 U.S. 421, 4 S.Ct. 122, 28 L.Ed. 204 (1884). To confiscate currency solely because it may have been close to a criminal transaction at some point in its history, or because of its denominations or amount, would infringe upon Congress' power to issue and circulate currency endowed with the quality of legal tender.

▮ Moreover, and no less important, the State Defendants' invocation of the forfeiture process under the circumstances violated the Debtor's constitutional due process rights. The State Defendants argue that the State justifiably seized and now owns the currency based on the whiff of a police narcotics dog. However, the dog cannot be cross-examined about what it smelled or how much, or how long the scent had been on the money. All the dog reaction justified under law was suspicion and a basis to investigate to determine if the money was used or was to be used in a criminal transaction. The constitutional underpinning of all forfeiture statutes is the state's interest in combatting crime. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Where, as here, there was no evidence of criminal activity involving use of the money, the invocation of the forfeiture statute was inconsistent with the Constitution of the United States.

▮ It is of no moment that the State Defendants say that the Debtor had her chance to litigate in a New Jersey forfeiture court. The Debtor should not, on these facts, have been subjected to that process in the first place. The State Defendants misapplied the statute even when it pressed for default judgment because it proffered no independent evidence of a drug or other criminal transaction involving the money. The State Defendants suggest that the bankruptcy court's ruling deprived them of civil discovery incident to the civil forfeiture. This argument is unavailing as the civil forfeiture was unconstitutionally commenced and because there was, and is, no impediment whatsoever to the State's criminal investigation powers.

## IV. THE DEBTOR WAS NOT RE-QUIRED TO PETITION FOR REMOVAL FROM STATE COURT.

▮ The State Defendants argue that the bankruptcy court should not have heard the Debtor's claim given her failure to petition for removal pursuant to 28 U.S.C. § 1452(a) ("§ 1452(a)"), which states that

[a] party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending.

Given the deficiency of the underlying seizure, the State Defendants' removal argument misses the mark. The State had no ground for claiming a possessory interest in the currency. Without proof of a drug transaction involving the money, all the State had was a guardian interest, that is, an interest in turning the money over to the proper owner. The Debtor claimed title to the money as part of her estate when she filed for bankruptcy. Any contrary

---

**4.** Congress is empowered "[t]o borrow Money on the credit of the United States." U.S. Const. art. I, § 8, cl. 2.

**5.** Congress is empowered "[t]o make all Laws which shall be necessary and proper for carry-

ing into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

claim of ownership, including a claim urged by the State, had to be heard as part of the bankruptcy action. Here, the bankruptcy court concluded that the issue of the State's possessory interest in the currency, which presented a federal question, had to be removed to federal court for decision. Consequently, there was no need for removal by a party to the state court proceeding.

## V. THE ELEVENTH AMENDMENT DOES NOT BAR THE DEBTOR'S TURNOVER CLAIM.

The State Defendants also contend that the Debtor's turnover claim is barred by the eleventh amendment. Defendant cites *Hoffman v. Connecticut Income Maintenance Department,* —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), in which the trustee sought to recover a money judgment from the state of Connecticut. The claim was for the recovery of Medicaid payments due the debtor and for the return of certain contested income tax payments. The trustee sought to recover the Medicaid payments under § 542(b) [6] and the income tax payments under 11 U.S.C. § 547(b) ("§ 547(b)").[7] The state replied that it was immune to suit by virtue of the eleventh amendment.[8] The trustee argued that by passing 11 U.S.C. § 106(c) ("§ 106(c)"),[9] Congress meant to abrogate the states' eleventh amendment immunity to claims brought under § 542(b) and § 547(b). The Court rejected the trustee's argument and ruled that his claims were barred by the eleventh amendment. The State Defendants argue that the Court's ruling in *Hoffman* applies with equal force to the instant case and that the Debtor's turnover claim is likewise barred.

■■■ *Hoffman* does apply in a limited sense, but within the Supreme Court's opinion is contained the rationale for distinguishing *Hoffman* from this case. *Hoffman* notes that "[t]he language of § 106(c)(2) is more indicative of declaratory and injunctive relief than of monetary recovery," and the Court "therefore construe[d] § 106(c) as not authorizing a monetary recovery from the States." 109 S.Ct. at 2823. The Court drew a critical distinction between injunctive relief and monetary recovery. Section 106(c) authorizes a bankruptcy court to order the former, but not the latter, against a state.

■■■ In *Hoffman,* the trustee sought monetary recovery of public funds which the state of Connecticut owed (the Medicaid reimbursement) or may have owed (the income tax abatement) to the debtor. In this case, however, the Debtor seeks injunctive relief: the return of funds belonging to the Debtor and seized by the State in the course of its law enforcement activities. Unlike the trustee in *Hoffman,* the Debtor

---

**6.** Section § 542(b) reads:

Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

**7.** Section § 547(b) provides that "the trustee may avoid any transfer of property of the debtor ... made on or within 90 days before the date of the filing of the petition." The trustee in *Hoffman* sought to recover taxes paid within the month prior to the debtor's filing for bankruptcy.

**8.** The eleventh amendment reads:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has interpreted the eleventh amendment to bar federal suits brought by citizens against their *own* states as well. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**9.** Section § 106(c) provides as follows:

Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor," "entity," or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

Both § 542(b) and § 547(b) contain trigger words—"entity" and "creditor," respectively. Section 542(a), under which the Debtor sues the State in this case, also contains the trigger word "entity." *See infra* Section VII.

does not seek to tap into state reserves to recover lawfully collected tax funds duly deposited into the state treasury in the ordinary course of government. It is only fortuitous that the seized property is currency and can be asserted, though incorrectly, as being part of the state treasury. The applicability of the eleventh amendment to claims for the return of property seized under state forfeiture statutes cannot logically depend upon the nature of the property seized. A logical and consistent analysis requires that a petition for the return of *any* seized property be construed as a request for prospective injunctive relief, to which the eleventh amendment poses no bar. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The language in *Hoffman, supra,* demonstrates that § 106(c) authorizes courts to issue injunctive relief against the states in order to enforce § 542.[10]

▇ The State Defendants counter with the argument that the State does in fact own the seized currency free and clear of any claim by the Debtor, and that the funds thus belong to the state treasury. The State bases its argument on New Jersey's "retroactive vesting" statute, N.J.S. 2C:64–7, which provides that "[t]itle to property forfeited under this chapter shall have vested in the entity funding the prosecuting agency involved at the time the item was utilized illegally or, in the case of proceeds, when received." The problem with the State Defendants' argument, however, is that they have put the "rabbit in the hat." The New Jersey vesting provision is triggered only by a proper determination that the seized property was "utilized illegally" or "received" pursuant to some illegal activity. The State Defendants, however, have failed to offer even a scintilla of evidence to support the proposition that the currency was received by the Debtor pursuant to some criminal enter-

prise. As a constitutional matter, retroactive vesting never took place.[11]

## VI. THE STATE'S FORFEITURE ACTION WAS AUTOMATICALLY STAYED UPON THE DEBTOR'S FILING FOR BANKRUPTCY.

### A. Section 362(a)

▇ Section 362 is the bankruptcy code's automatic stay provision. The automatic stay is described by its drafters as

one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.Code & Ad.News 5963, 6296. The drafters note that the Debtor is granted a "breathing spell from his creditors." While the stay does apply most often to creditors, the scope of Section 362 is by its own terms broader. Section 362(a) lists the circumstances under which the Code's automatic stay applies, and among those circumstances are those covered by Section 362(a)(1) (emphasis added):

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to *all entities*, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that

---

**10.** In contrast, *Hoffman* shows that 11 U.S.C. § 362(h) does *not* apply to the states. *See infra* Section VIII.

**11.** Even in *Ryan II,* where the debtor was charged and convicted of drug offenses, the

court found that "granting [the retroactive vesting theory] legal status after the filing of a petition in bankruptcy would be to exalt state law over federal law, violating both the supremacy and bankruptcy clauses of the United States Constitution." *Ryan II,* 32 B.R. at 797.

arose before the commencement of the case under this title.

The State qualifies under this definition, whether or not it is construed as a creditor, since the State is an "entity" which pursued a default judgment against the Debtor after she filed for bankruptcy.

■ It is irrelevant that the State Attorney General's Office did not receive notice until after the default judgment had been entered. The filing of a bankruptcy petition acts as an automatic stay and operates independent of any subsequent notice to creditors or other interested parties. *In re Boston Business Machines*, 87 B.R. 867, 870 (Bankr.E.D.Pa.1988); *Brown v. National City Bank*, 8 Ohio Misc.2d 40, 457 N.E.2d 957 (1983); *Matter of Carter*, 16 B.R. 481 (W.D.Mo.), *aff'd*, 691 F.2d 390 (8th Cir.1981). Given that the Debtor filed for bankruptcy prior to the entry of the default judgment, the State's forfeiture action was stayed before it reached completion.

■ The State Defendants' characterization of the forfeiture proceeding as *in rem* is insufficient to remove it from the scope of § 362(a)(1). While the suit may formally have been brought against the seized currency, it is in reality the Debtor (and now the Trustee) against whom the State is litigating and from whom it seeks to obtain title to the disputed funds. Where federal and state jurisdiction clash, "[t]he aim and effect of the action, not the statutory designation invoked by the plaintiff, determines if it is *in rem*." *State of New Jersey v. Moriarity*, 268 F.Supp. 546, 547 n. 15 (D.N.J.1967). The State cannot be permitted to evade the coverage of § 362 by declaring that its forfeiture action is directed against the cash rather than the Debtor and therefore remains unaffected by the automatic stay.

■ Nor can the State Defendants nullify the effect of § 362 by arguing that the Debtor has no interest in the seized funds based on the notion that the State owns the seized property outright pursuant to New Jersey's retroactive vesting statute, N.J.S. 2C:64-7. As discussed in the context of the State's eleventh amendment argument, *supra* Section V, the complete lack of evidence of the Debtor's criminal use or receipt of the seized funds renders the retroactive vesting statute inapplicable. Therefore, this court agrees with the bankruptcy courts in *Ryan II* and *In re Reid*, which held that § 362 applies to state forfeiture proceedings. *See supra* Section II.

### B. *Section 362(b)*

■ The State Defendants argue that, even if § 362(a) applies to its forfeiture claim, § 362(b) excepts the State from coverage. Section 362(b) creates several exceptions to the automatic stay, including the exception listed under § 362(b)(4):

> (b) The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay—

> .    .    .    .    .

> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

The State Defendants argue that the State's seizure and attempted forfeiture of the $7,990 amounts to an exercise of its "police or regulatory power" which should be excepted from the scope of the stay provision. That well-sounding argument, however, is dependent upon compliance with the forfeiture statute on its face. Because that requirement was not met in this case, the operation of the stay cannot be excepted by § 362(b)(4).

The Supreme Court upheld state forfeiture laws as constitutional in *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 686–87, 94 S.Ct. 2080, 2093–94, 40 L.Ed.2d 452 (1974), emphasizing that

> state lawmakers, in the exercise of the police power, were free to determine that certain uses of property were undesirable and then establish "a secondary defense against a forbidden use...." [*Van Oster v. Kansas*, 272 U.S. 465,] 467 [47 S.Ct. 133, 134, 71 L.Ed. 354]....

> Forfeiture of conveyances that have been used—and may be used again—in violation of the narcotics laws fosters the

purposes served by the underlying criminal statutes, both by preventing further illicit use of the conveyance and by imposing an economic penalty, thereby rendering illegal behavior unprofitable.

Civil forfeiture statutes work hand-in-hand with criminal statutes to punish the criminal wrongdoer and to deter further criminal activity by depriving the owner of the criminally useful property. Legislating the seizure of tainted drug money is thus a reasonable and important method of exercising a state's police power.

The fact that the property seized here was currency should not obscure the real issues. Just as its monetary form might lend the turnover of the seized currency to look at first blush like a payment from the state treasury, the property's monetary form might lead one to construe a forfeiture proceeding as an attempt to collect a debt. Again, however, a logical and coherent analysis demands that the seized funds be considered in its general forfeiture context and not as money *per se.* Considered in that light, enforcing the forfeiture of money—or of any illicitly used or received property—is clearly an exercise of the state's police power.

The controlling third circuit case, *Penn Terra v. Department of Environmental Resources,* 733 F.2d 267 (3rd Cir.1984), confirms this analysis. While *Penn Terra* deals with the enforcement of environmental protection laws rather than a forfeiture statute, it shows that the enforcement of any forfeiture statute would also be covered by § 362(b)(4). To determine the question of coverage by § 362(b)(4), a court must examine

> the nature of the injuries which the challenged remedy is intended to redress—including whether plaintiff seeks compensation for past damages or prevention of future harm—in order to reach the ultimate conclusion as to whether these injuries are traditionally rectified by a money judgment and its enforcement.

*Penn Terra,* 733 F.2d at 278. Forfeiture statutes are legislated and enforced for the purpose of criminal deterrence. Like the environmental protection laws at issue in *Penn Terra,* forfeiture statutes aim at the "prevention of future harm" rather than "compensation for past damages." In seeking forfeitures the state is not out to collect monetary debts but to advance public policy in the area of law enforcement.

Implicit in this analysis, however, is the underlying assumption that the state is exercising its police/regulatory power in a *legitimate* fashion, both at the legislative and enforcement stages. The cases cited by the State Defendants themselves express this requirement. *State v. 1979 Pontiac Trans Am. Color Grey,* 98 N.J. 474, 481, 487 A.2d 722 (1985) ("[u]ltimately, forfeiture statutes are justifiable to the extent that they are a legitimate exercise of the police power"); *Kutner Buick, Inc., v. Strelecki,* 111 N.J.Super. 89, 99, 267 A.2d 549 (Ch.Div.1970) ("[forfeiture statutes'] validity depends on their reasonable necessity to accomplish a legitimate purpose under the police power").

Section 362(b)(4) exempts from the automatic stay "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." Yet the State must have some fact basis consistent with the authorizing power of the forfeiture statute for claiming that it is enforcing its police or regulatory power. It cannot merely act at will and claim the protection of the police/regulatory power exemption. It cannot, as in this case, seize, retain, and claim ownership of property with no basis in fact for claiming that the property is subject to forfeiture under state law. Otherwise states would be granted unbridled discretion to preempt federal bankruptcy law by the mere seizure of property and subsequent utterance of the magic word "forfeiture".

The Supreme Court has approved state forfeiture statutes on the basis that such statutes provide states with a potent tool with which to thwart the commission of future crimes. *Calero–Toledo,* 416 U.S. at 686–87, 94 S.Ct. at 2093–94. The very potency of that tool requires that its use be justified on the facts. Where, as here, there is no apparent factual justification

for its use, such a tool cannot provide the State with an avenue of escape from federal law, namely, the application of the automatic stay provision of the bankruptcy code.

### C. *Section 362(d)*

■ Even where the stay applies, the court may grant a petition to lift the stay pursuant to § 362(d). The State Defendants did not petition for relief from the stay. Even if it had, the proper decision would have been to deny such a petition. Given its lack of evidentiary support for forfeiture, the defendants had no legitimate interest in pursuing the forfeiture in state court. In *Ryan II*, the bankruptcy court granted the state's petition to lift the automatic stay and allowed a forfeiture claim to proceed in state court, even though it made clear that its decision to lift the stay was a difficult and close one despite the fact that the debtor was indicted and convicted for drug offenses. 32 B.R. at 797. In contrast to *Ryan II*, there are no factors in this case to suggest that the state has any legitimate interest in pursuing its forfeiture claim in state court.

### VII. THE SEIZED FUNDS MUST BE TURNED OVER TO THE TRUSTEE PURSUANT TO SECTION 542.

■ The bankruptcy court ruled that the State had no forfeiture interest in the seized funds, which must therefore be turned over to the Trustee pursuant to § 542(a).[12] This court agrees. There is no evidence to indicate that the seized currency qualifies under any of the listings of 2C:64–1, which means that the State has no interest in the money. *See supra* Section III. Consequently, the State Defendant arguments concerning removal, the eleventh amendment, and the automatic stay provision must fail. The State Defendants are left to assert their interest before the Trustee in the Debtor's bankruptcy action.

For the reasons stated herein, they must turn the seized currency over to the Trustee to be administered as part of the Debtor's estate pursuant to § 542.

### VIII. SECTION 362(h) DOES NOT PERMIT AN AWARD FOR ATTORNEY'S FEES AGAINST THE STATE.

■ The bankruptcy court ruled that the Debtor was entitled to an award for attorney's fees pursuant to § 362(h), which provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." Even if the bankruptcy court is correct in concluding that the State Defendants willfully violated the stay by failing to turn the seized funds over to the Trustee, § 362(h) does not help the Debtor. In *Hoffman*, the Supreme Court examined the interaction of the eleventh amendment and the bankruptcy code in order to determine the applicability of various bankruptcy provisions to the states. In examining whether Congress intended to abrogate state sovereign immunity, four Justices considered § 362(h) and contrasted it to §§ 542(b) and 547(b), provisions in which they, contrary to the majority of the Court, found Congressional waivers of sovereign immunity. *See supra* Section V. They stated that § 362(h) does not abrogate state sovereign immunity, and that Congress did not intend for § 362(h) to apply to the states or to state officials acting in their official capacities:

> Several Code provisions that permit money judgments do not apply to States. For example, § 362(h) (1982 ed., Supp. V) provides that an individual injured as a result of a willful violation of an automatic stay may recover actual damages and, where appropriate, punitive dam-

---

**12.** Section 542(a) reads:
Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or

that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

ages. Because § 362 contains no trigger words, it does not apply to States. *Hoffman,* 109 S.Ct. at 2826 n. 4. (dissenting opinion of Justice Marshall, joined by Justices Brennan, Blackmun, and Stevens), citing *Prime, Inc. v. Illinois Dept. of Transp.,* 44 B.R. 924, 925–27 (Bankr.W.D. Mo.1984), and *Gillman v. Board of Trustees of Alpine School Dist.,* 40 B.R. 781, 788–90 (Bankr.Utah 1984). This analysis of § 362(h) indicates that the Court would not interpret Congress to have authorized awards of attorney's fees against state defendants. Because there is no other statute authorizing such an award, that portion of the bankruptcy court's judgment awarding attorney's fees to the Debtor must be vacated.

In all other respects the bankruptcy court's judgment is affirmed.