**In re MOUNT MORIAH ELEVATOR, INC., Debtor.**

**Bruce E. STRAUSS, Trustee, Plaintiff,**

v.

**STATE OF MISSOURI DEPARTMENT OF AGRICULTURE, Defendant.**

**Bankruptcy No. 92–50405.
Adv. No. 92–5019.**

United States Bankruptcy Court,
W.D. Missouri.

Aug. 7, 1992.

Motion for Stay Pending Appeal Denied
Oct. 1, 1992.

Scott B. Haines, Merrick, Baker, Fox, Hufft & Strauss, Kansas City, Mo., for plaintiff.

Mark Weaver, State of Mo., Office of Atty. Gen., Jefferson City, Mo., for defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

This is a grain elevator Chapter 7 case. The Chapter 7 trustee has filed a Complaint for Turnover of certain funds held by the Missouri Department of Agriculture ("the Department"). The Department has moved to dismiss such Complaint pursuant to the Eleventh Amendment to the United States Constitution, and also based on its contention that the monies held by it are not an asset of the debtor's bankruptcy estate. The Department has also filed a motion to lift the automatic stay to allow it to proceed with distribution of funds held by it. This is a core proceeding under 28 U.S.C. § 157(b)(2), over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). With the consent of both parties, all these matters were heard on an expedited basis on August 5, 1992. The expedited hearing was necessary because State proceedings concerning distribution of the proceeds are scheduled for August 12, 1992. I find in favor of the Chapter 7 trustee, with certain reservations and limitations which will be explained.

Prior to April, 1992, the debtor had two stockholders, Leland Kay Stoner and his former wife, Janice J. Stoner. The Stoners had been separated for approximately six years, during which time Janice Stoner had operated the elevator. Janice Stoner died on April 22, 1992. On April 27, 1992, the Department took possession of the elevator and obtained from the Circuit Court of Harrison County, Missouri, an Order authorizing it to take possession of the debtor's records, to liquidate the grain-related assets of the debtor, and to deposit the proceeds therefrom in an interest-bearing escrow account. Mo.Rev.Stat. § 276.501 (1986)[1]. Thereafter, Leland Stoner learned

---

1. Section 276.501 provides in relevant part as follows:
    1. If at any time the director has evidence that a dealer is insolvent or is unable to satisfy the claims of all sellers, the director may petition the circuit court in the county where the dealer's principal place of business is located as shown on the license application, for an ex parte order authorizing the director or his authorized agent to seize, and take title and possession, as trustee, of any grain in the dealer's possession or under the dealer's control, and of all pertinent records and property as provided for in subsection 2 of this section.
    2. Upon receipt of the director's verified petition setting forth the circumstances of the dealer's failure to comply with sections 276.-501 to 276.581, and further stating reasons

why immediate possession by the director or his authorized agent is necessary for the protection of grain sellers or sureties, the court is authorized to issue an ex parte order authorizing the director or his authorized agent to take immediate possession for the purposes stated in this section. A copy of the petition and order shall be sent to the dealer. If appropriate, the court may order the director's taking possession of only grain-related assets and not the entire business of the dealer. Such order may include, but is not limited to, the following:
      . . . .
    (5) Authorizing the director to redeliver or sell depositor or dealer-owned grain, as appropriate in the circumstances and setting forth the conditions for doing such;

that there may have been preferential payments made by the debtor immediately prior to Janice Stoner's death. The debtor at that time allegedly borrowed $200,000 from a bank, and such proceeds are no longer available. At least in part as a result of such discovery this bankruptcy case was filed on or about July 14, 1992.

Subsequent to obtaining the order from the Circuit Court of Harrison County, the Department proceeded to liquidate certain of the assets of the debtor. These assets consisted of stored yellow corn ($35,213.03), stored soybeans ($9,465.41), a seat on the grain exchange, cash, monies in a checking account, and an income tax refund due from the Internal Revenue Service. The Department has taken possession of all such proceeds. In addition, the State is holding Certificates of Deposit totalling $36,078.90, which certificates were previously posted by the debtor in lieu of a bond for the benefit of grain dealer claims under Chapter 276 of the Missouri statutes. The total funds held by the State are $86,-023.52, excluding accrued interest.

The debtor has filed with the Court Chapter 7 Schedules listing unsecured claims of $208,136.15, plus tax claims of $303.00. Approximately 90 percent of such scheduled claims appear to represent monies due grain producers. The remaining claims are held by non-farm creditors. It is the Department's position that, under state statute, all proceeds held by it, including the income tax refund, cash, and the proceeds from the sale of the seat on the grain exchange should be distributed first to the holders of the grain claims pro rata. In the event such proceeds are not sufficient to pay all such claims, the holders of non-grain unsecured claims would receive nothing. The Bankruptcy Code contains a different distribution scheme. *See* 11 U.S.C. § 507. Under the Code, grain producers

are entitled to a priority claim to the extent of $2,000 per individual. 11 U.S.C. § 507(a)(5). The remainder of grain claims would then be treated as unsecured non-priority claims, to be paid pro rata alongside the non-grain unsecured claims. The issue here, then, is which of these distribution schemes will control distribution of the monies now held by the Department.

The Department makes three basic arguments in support of its position, each of which is considered below.

## DISCUSSION

### I. PROPERTY OF THE ESTATE

The Department contends that the funds held by it are not an asset of the debtor's bankruptcy estate under 11 U.S.C. § 541,[2] and, therefore, are not the proper subject of a turnover action.

In *State of Missouri v. United States Bankruptcy Court for the Eastern District of Arkansas*, 647 F.2d 768 (8th Cir. 1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982), the Court considered whether a writ of prohibition should be entered prohibiting the bankruptcy court from exercising jurisdiction over a grain elevator. In that case, unlike this one, the grain in question had not yet been entirely sold, and the elevator was being operated on a daily basis by the bankruptcy trustee. The State of Missouri argued that grain held by such elevator was not an asset of the bankruptcy estate, and that, therefore, the Department should be allowed to liquidate such grain. The Eighth Circuit disagreed, finding that in light of the broad definition of "property" under section 541 of the Bankruptcy Code, the debtor's interests in the grain were sufficient "to trigger preliminary jurisdiction of the property in the Bankruptcy Court."

(6) Authorizing the director to deposit all grain-related assets and proceeds therefrom in an interest-bearing escrow account to be disbursed only upon orders of the court....

**2.** 11 U.S.C. § 541(a) provides in relevant part as follows:

(a) the commencement of a case under section 301, 302, or 303 of this Title creates an

estate. Such estate is comprised of all of the following property, wherever located and by whomever held:

(1) except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case....

*Id.* at 774. The Court went on to state that "[o]f course, the bankruptcy court must make the final determination of property interests after full presentation of the evidence." *Id.* In so holding, the Court emphasized that a bankruptcy action pre-empts state insolvency proceedings.

■ The grain here in question is not specifically owned by, or identifiable to any particular grain producer. Nor is it owned by the state. Therefore, it can only be an asset of the debtor's estate, to be liquidated by the trustee and distributed to creditors.

The Department attempts to distinguish *State of Missouri v. United States Bankruptcy Court for the Eastern District of Arkansas*, by stating that there, the grain assets in question remained in the debtor's or trustee's possession, whereas in this case the department had seized the assets and was in possession of such, or the proceeds thereof, prior to the filing of the bankruptcy petition.

■ The fact that property previously held by a debtor has been seized pre-petition does not prevent such property from becoming part of the debtor's estate. Instead, the bankruptcy court must determine whether the property would be property of the estate had it not been seized, and, if so, whether the bankruptcy case would be advanced by returning such property to the debtor.

In *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 206–207, 103 S.Ct. 2309, 2314–2315, 76 L.Ed.2d 515 (1983), certain assets of the debtor had been seized by the IRS prior to the filing of the bankruptcy petition. In ordering turnover, the Supreme Court found that "to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate." *Whiting Pools*, 462 U.S. at 203, 103 S.Ct. at 2313.

■ Here, similarly, turnover of the seized assets is necessary if those assets are to be distributed in compliance with the Bankruptcy Code. Congress provided for specific procedures applicable only to debtors which own or operate grain storage facilities and only with respect to grain and the proceeds thereof. *See* 11 U.S.C. § 557. In so doing, Congress pre-empted any inconsistent state regulatory procedures. *State of Missouri v. United States Bankruptcy Court, supra.* To say that the assets being held by the Department are not assets of the estate within the jurisdiction of this Court would thwart the Congressional intent to provide a meaningful and expedient process by which interests in such assets are to be determined under section 557. Therefore, the proceeds from the liquidation of the grain-related assets, the tax refund, cash, checking account proceeds, and any other assets, with the possible exception of the Certificate of Deposits, constitute property of the estate.

■ As to the Certificates of Deposit, it appears preliminarily that such certificates were pledged for the benefit of a specific group of beneficiaries, namely the grain producers. If so, proceeds from such Certificates of Deposit should be distributed solely to such grain producers pursuant to applicable Missouri law. While the Department could certainly carry out distribution of the Certificate of Deposit proceeds, that would require the Department to determine the allowability of grain producer claims. Not only would that duplicate the process this court will use in allowing claims, but it also would run the risk of inconsistent results as to the amounts owed such grain producers. Therefore, the trustee will be directed to place funds from such Certificates of Deposit, and any interest which has accrued thereon, in a segregated account pending a final determination as to whether such proceeds should be accorded separate treatment as pledged assets. Any other assets, including grain proceeds, the tax refund, cash, checking account proceeds, or proceeds from other assets which were not taken by the Department, but which might later be sold by the trustee, appear to be assets of the estate which should be administered by the bankruptcy trustee pursuant to the provisions of the Bankruptcy Code.

## II. AUTOMATIC STAY

The Department next contends that the automatic stay should be lifted to allow it to proceed with its action to distribute proceeds held by it. In effect, the Department is contending that the automatic stay is not applicable pursuant to Section 362(b)(4), which provides the stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power...." In *State of Missouri v. United States Bankruptcy Court for the Eastern District of Arkansas*, 647 F.2d 768, the State made the same argument. The Eighth Circuit found that the term "police or regulatory power" refers "to the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the Bankruptcy Court." *Id.* at 776. The Court concluded that "Missouri's grain laws, although regulatory in nature, primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health. Missouri's laws, by governing the operation and liquidation of grain warehouses directly conflict with the control of the property by the Bankruptcy Court and, therefore, do not fall within the Section 362(b)(4) exception." *Id.* As indicated previously, in *State of Missouri v. United States Bankruptcy Court*, the grain elevator had not been closed, and the bankruptcy trustee was authorized to operate such elevator on a day-to-day basis. Certainly, the facts in that case pose a much greater potential harm to the public good than is present in this Chapter 7 case, where the grain in question has been liquidated and the bankruptcy trustee is not seeking to operate the elevator. The Department points out that, subsequent to the decision in *State of Missouri v. U.S. Bankruptcy Court*, the Missouri legislature amended its statute to provide specifically that its grain dealer law "constitutes an exercise of state police and regulatory powers for the purpose of protecting and enhancing grain production and marketing, and the agricultural economy of the State of Missouri. These sections are deemed necessary to protect and preserve the public health, welfare, peace and safety of the general citizenry." Mo. Rev.Stat. § 276.403 (1986). However, when interpreting the Bankruptcy Code, this Court is not bound by labels which the State may choose to attach to its legislation. *See, e.g., In re Williams*, 703 F.2d 1055, 1057 (8th Cir.1983) (in determining whether an obligation to an ex-spouse is nondischargeable maintenance under the Bankruptcy Code, "bankruptcy courts are not bound by state laws that define an item as maintenance or property settlement, nor are they bound to accept a divorce decree's characterization of an award as maintenance or a property settlement.") One important consideration here is whether the State is enforcing state laws that in fact affect health, welfare, peace, and safety. For the reasons set forth in the Eighth Circuit's opinion in *State of Missouri v. United States Bankruptcy Court*, the State's regulatory apparatus primarily relates to the protection of pecuniary interests in the debtor's property, and not to matters of public safety and health.

The Eighth Circuit has recently rejected the view that the section 362(b)(4) exception to the automatic stay applies only to actions to protect public health or safety. *In re Commonwealth Cos., Inc.*, 913 F.2d 518, 521 (8th Cir.1990). However, in this case, not only is the purpose of the state's regulatory scheme not related to public health or safety, but the Department's plan to distribute the assets it holds in trust also directly conflicts with the distribution scheme set forth under the Bankruptcy Code. Therefore, the section 362(b)(4) exception is not applicable here. *See State of Missouri v. United States Bankruptcy Court for the Eastern District of Arkansas*, 647 F.2d at 776.

## III. ELEVENTH AMENDMENT

The Department also contends that the Trustee's turnover action is barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides as follows:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

Despite the limiting language contained therein, the United States Supreme Court has consistently construed the Eleventh Amendment to provide immunity to an unconsenting State against judicial actions in federal courts brought against that State by her own citizens as well as by citizens of another State. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986) (citing *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). According to the Supreme Court, "the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

In arguing that a State enjoys Eleventh Amendment immunity against a bankruptcy trustee's turnover action, the Department relies primarily on *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). The trustee in *Hoffman* brought adversary proceedings against two Connecticut state agencies seeking to collect funds under sections 542(b) and 547 of the Bankruptcy Code. The section 542(b) action involved an attempt to collect a payment for services rendered by the debtor prepetition. The section 547 action sought to recover moneys allegedly transferred by the debtor preferentially to the Connecticut Department of Revenue Services. The issue addressed by the Supreme Court was whether 11 U.S.C. § 106(c) authorized a bankruptcy court to enter a money judgment against a state that had not filed a proof of claim in the bankruptcy proceed-

ing.[3] The plurality of the Court held that nothing in section 106(c) was indicative of Congressional intent to waive sovereign immunity to enable the trustee to recover a money judgment against the State. *Hoffman,* 492 U.S. at 104–05, 109 S.Ct. at 2824.

The facts of this dispute are readily distinguishable from those in *Hoffman.* In this action, the bankruptcy trustee, rather than seeking a money judgment that will be collected from the public funds of the State, seeks this Court's order requiring the Department to return to him property of the bankruptcy estate, which property is being held by the state as a stakeholder. The trustee here, in order to be successful, is not required to establish the existence of a debt owed by the state to the debtor as section 542(b) required in *Hoffman. See In re Groves,* 120 B.R. 956, 964 (Bankr.N.D.Ill.1990). "Instead, this trustee's action lies under § 542(a) and is more in the nature of declaratory or injunctive relief than an action for monetary judgment." *Id.* As the District Court for the Eastern District of Pennsylvania stated in *In re James,* 120 B.R. 802 (E.D.Pa.1990), *rev'd on other grounds,* 940 F.2d 46 (3d Cir.1991), "[t]he applicability of the eleventh amendment to claims for the return of property seized" by the state under its regulatory powers "cannot logically depend upon the nature of the property seized. A logical and consistent analysis requires that a petition for the return of *any* seized property be construed as a request for prospective injunctive relief, to which the eleventh amendment poses no bar." *James,* 120 B.R. at 813 (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)) (emphasis original).

In this case, the money will not be paid from public funds in the state treasury, but rather from the interest-bearing escrow account being held by the Department as escrow agent. As discussed above, the money held in that account, with the possible exception of the proceeds from the Certificates of Deposit, represents property of

---

**3.** The parties in *Hoffman* did not dispute that, absent section 106(c) abrogation of state immunity, the Eleventh Amendment would bar the trustee's actions. *See Hoffman,* 492 U.S. at 100–02, 109 S.Ct. at 2822.

the bankruptcy estate. I find that, given the circumstances of this case, the Eleventh Amendment does not bar the instant adversary proceeding brought by the trustee against the Department.[4]

## CONCLUSION

For the foregoing reasons, I find that the Trustee's Complaint for Turnover should be sustained. However, the proceeds received by the Trustee from the Certificates of Deposit, and the accrued interest thereon, should be placed in a segregated account until a determination can be made as to whether such proceeds should be made available only to grain producers.

The Court is aware that persons holding claims against this debtor are properly concerned that proceeds be distributed as quickly as possible. Section 557 of the Bankruptcy Code allows the Court, on its own motion to expedite the procedures for the determination of interests in and the disposition of grain and the proceeds of grain, so that all procedures concerning distribution of such proceeds can be completed within 120 days. Therefore, in order to put the Trustee in a position to distribute proceeds as quickly as possible, the Trustee should, within 10 days, file with the Court a proposed timetable for completion of all procedures necessary for distribution of proceeds to be received by him.

An Order consistent with this Opinion will be issued this date.

---

**4.** It should be noted that in circumstances where a suit against the state seeks to bring an end to a violation of federal law, the eleventh amendment is not applicable even if there is a substantial ancillary effect on the state treasury. *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986) (citing *Milliken v. Bradley,* 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977); *Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1357–58). Here, while the Chapter 7 trustee seeks to avoid a distribution of proceeds which would be inconsistent with the federal Bankruptcy Code, the trustee's action should have no impact whatever on the state treasury.